# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

|  |  |
|---|---|
| **CORNELIUS CAMPBELL BURGESS**,<br><br>          *Plaintiff*,<br><br>  *v.*<br><br>**FEDERAL DEPOSIT INSURANCE CORPORATION**; **MARTIN J. GRUENBERG**, in his official capacity as Acting Chairman of the FDIC; **MICHAEL J. HSU**, in his official capacity as a Director of the FDIC; **ROHIT CHOPRA**, in his official capacity as a Director of the FDIC; and **JENNIFER WHANG**; in her official capacity as an Administrative Law Judge,<br><br>          *Defendants*. | Civil Action No. <u>7:22-cv-00100</u><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Manuel G. Berrelez (Texas Bar No. 24057760)
   mberrelez@velaw.com
Thomas P. Mitsch (Texas Bar No. No. 24102218)
   tmitsch@velaw.com
James F. Hopper (Texas Bar No. 24116535)
   jhopper@velaw.com
Madelyn B. Carter (Texas Bar No. 24121529)
   mcarter@velaw.com
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716

*Counsel for Plaintiff Cornelius Campbell Burgess*

Plaintiff Cornelius Campbell Burgess ("Burgess") files this Complaint against the Federal Deposit Insurance Corporation ("FDIC"); Martin J. Gruenberg ("Chairman Gruenberg"), in his official capacity as Acting Chairman of the FDIC; Michael J. Hsu ("Director Hsu"), in his official capacity as a member of the board of directors of the FDIC; Rohit Chopra ("Director Chopra"), in his official capacity as a member of the board of directors of the FDIC; and Jennifer Whang ("ALJ Whang"), in her official capacity as one of the administrative law judges used by the FDIC.

Burgess, by and through his undersigned attorneys, alleges as follows:

## <u>INTRODUCTION</u>

1.      The purpose of this lawsuit is to prevent the FDIC, its directors, and an administrative law judge from continuing an unconstitutional enforcement action against Burgess.

2.      Burgess served as the Chief Executive Officer of Herring Bank from 2000 to 2012, and as the President of Herring Bank from 2002 to 2012. Herring Bank is a community bank that was founded by Burgess's great-great-grandfather in Vernon, Texas in 1899. When Burgess first joined Herring Bank in 1992, the bank had approximately $90 million in assets and just one branch. Under Burgess's leadership, the bank added 14 branches and increased its assets more than six-fold. Herring Bank's success was enabled by Burgess's strategic acquisitions of other banks, as well as Burgess's innovative diversification of the bank's income streams through the addition of new products and services that dramatically increased the bank's non-interest income. Burgess has often been described by his peers (and even by his regulators) as a banking "visionary."

3.      The FDIC is a so-called "independent agency" that enforces certain federal banking laws. The FDIC employs more than 5,000 bureaucrats throughout the United States.

4.      For more than a decade, the FDIC has pursued an extraordinary campaign of harassment against Burgess. The initial impetus for the FDIC's hostility towards Burgess was the

agency's unsubstantiated belief that Burgess was to blame for losses sustained by Herring Bank as a result of a Ponzi scheme to which the bank fell victim.  In 2010, the FDIC was given an excuse to begin an investigation of Burgess when it received a tip that he was using Herring Bank's funds to renovate his house.  Although those charges were false, the ensuing investigation matured into a formal administrative adjudication (the "Enforcement Proceeding") in which the FDIC claims that Burgess improperly charged personal expenses to Herring Bank.  The FDIC's Enforcement Proceeding is a stalking horse through which unelected bureaucrats employed by the FDIC seek to punish Burgess because they (1) wrongly blame Burgess for losses incurred by the bank as a result of fraud committed by third parties; (2) harbor political disagreements with Burgess concerning the wisdom of certain financial-services products and services; (3) object to Burgess's decisions to provide banking services to businesses operating in certain politically disfavored industries; and (4) disagree with certain aspects of Burgess's managerial style.

5.      On September 16, 2022, an administrative law judge ("ALJ") issued a decision recommending that Burgess (1) be removed from his positions at Herring Bank and its parent holding company; (2) be prohibited from working <u>anywhere in the American banking industry for the rest of his life</u>; and (3) be forced to pay a "civil monetary penalty" of $200,000.

6.      Although Burgess strongly disagrees with the allegations that the FDIC has levied against him, this lawsuit has nothing to do with the merits of those allegations.  Instead, this lawsuit is entirely about <u>how</u> the FDIC is adjudicating its allegations against Burgess.

7.      The Enforcement Proceeding is unconstitutional for three independent reasons.

8.      <u>First</u>, the structure of the FDIC's board of directors is unconstitutional.  In *Seila Law LLC v. CFPB*, the Supreme Court held that the President must be able to remove, at will, the heads of independent agencies that are "vested with significant executive power."  140 S. Ct. 2183,

2201 (2020).  The FDIC wields significant executive power because it routinely conducts enforcement actions that have a significant impact on the livelihoods of regulated parties and on the national economy more generally.  But the President cannot remove a majority of the FDIC's Board (the "Board") except for good cause shown.  This arrangement violates fundamental separation-of-powers principles and renders the entire Enforcement Proceeding unconstitutional.

9.     *Second*, the tenure protections afforded to the ALJs used by the FDIC are unconstitutional.  In recent years, new case law from the United States Supreme Court has clarified two important principles of law.  The first of those principles is that the President cannot "be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer."  *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010) (*"PCAOB"*).  That is so because so-called "double for-cause removal protections" for inferior officers of the United States violate the Take Care Clause.  *Id.* at 538.  The second principle is that ALJs are inferior officers of the United States.  *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018).

10.     Given these two principles of law, this is not a difficult case.  There is no dispute that the ALJs used by the FDIC are "officers" of the United States; indeed, the Fifth Circuit issued a published decision at a prior stage of this very dispute that so held.  *See Burgess v. FDIC*, 871 F.3d 297, 302-03 (5th Cir. 2017).  Likewise, there can be no dispute that the ALJs used by the FDIC enjoy at least two levels of protection from removal:  Those ALJs can only be fired if the Merit Systems Protection Board ("MSPB") determines that there is cause for their termination, and the members of the MSPB in turn can only themselves be removed from their offices for cause.

11.     In fact, the removal protections for the ALJs used by the FDIC are even more defective than the removal protections found unconstitutional in *PCAOB*.  That is so because ALJs

who work for the FDIC are part of an obscure administrative entity known as the Office of Financial Institution Adjudication ("OFIA"). OFIA describes itself as an "inter-agency group" of ALJs who work for four separate federal agencies with related jurisdiction (the "Banking Agencies"). Until recently, this obscure "Office" was so opaque that regulated parties did not even know the details of its internal structure. By leveraging document requests pursuant to the Freedom of Information Act, regulated parties have recently been able to extract the Banking Agencies' non-public internal memoranda of understanding concerning OFIA. Remarkably, those memoranda establish that OFIA's ALJs—including Defendant ALJ Whang, who is presiding over the Enforcement Proceeding against Burgess—cannot even be referred to the MSPB for removal proceedings **unless all four of the Banking Agencies unanimously agree on that course of action**. To make matters worse, three of the four Banking Agencies—including the FDIC itself— are agencies headed by multi-member bodies in which a majority of the agency's directors enjoy for-cause protection against removal. All of this means that, in order to fire an ALJ, at least 11 separate bureaucrats would have to independently agree; of those 11 people, at least 9 cannot be fired at will by the President. That arrangement is blatantly unconstitutional.

12.     <u>Third</u>, the Enforcement Proceeding violates the Seventh Amendment because it deprives Burgess of his right to a jury trial. In its recent published decision in *Jarkesy v. SEC*, the Fifth Circuit explained that the Seventh Amendment guarantees a jury trial in any administrative enforcement action "akin to traditional actions at law," specifically including "actions seeking civil penalties." 34 F.4th 446, 451-52 (5th Cir. 2022). The Enforcement Proceeding is exactly such an action. This case is essentially a carbon copy of *Jarkesy*, where the Fifth Circuit held that the Petitioner was entitled to a jury trial, and not merely an agency "hearing," in a case where the Securities and Exchange Commission ("SEC") sought civil penalties against him. *Id.* at 451-59.

13.     Burgess is entitled to a judgment declaring that the entire Enforcement Proceeding violates the Constitution and that the FDIC may not continue that tainted proceeding in any way. Burgess also respectfully submits that he is entitled to a stay of or injunction against the Enforcement Proceeding pending disposition of the claims presented in this Complaint.

## JURISDICTION AND VENUE

14.     This Court has competent subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the United States Constitution. *See Cochran v. SEC*, 20 F.4th 194, 198-204 (5th Cir. 2021) (en banc) (noting that federal district courts have jurisdiction to adjudicate constitutional claims challenging the structure of an agency, regardless of the contemporary pendency of related agency proceedings), *cert. granted*, 142 S. Ct. 2707 (2022).

15.     This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and under its inherent equitable powers.

16.     Venue is proper in this District because "a substantial part of the events or omissions giving rise to the claim occurred" in the cities of Seymour and Vernon, Texas, where Herring Bank maintains branches. *See* 28 U.S.C. § 1391(e)(1)(B). Herring Bank was founded in Vernon in 1899 and has continually maintained a branch there for more than a century. Seymour and Vernon are located in Baylor and Wilbarger Counties, respectively, both of which are within the Wichita Falls Division of the United States District Court for the Northern District of Texas.

## PARTIES

### A.     Plaintiff

17.     Plaintiff Cornelius Campbell Burgess is a natural person who maintains his principal residence in this District. Between 2000 and 2012, Burgess served as the Chief Executive Officer of Herring Bank, over which the FDIC has regulatory jurisdiction. *Cf.* 12 U.S.C. §

1813(c)(2).  Burgess currently serves on Herring Bank's Board of Directors as Vice Chairman.
He also serves as President and Vice-Chairman of Herring Bank's holding company.

**B.**    **Defendants**

18.    The Federal Deposit Insurance Corporation is an agency of the federal government
that, among other things, supplies deposit insurance to depositors in American banks and other
depository institutions.  *See* 12 U.S.C. §§ 1811(a), 1815, 1817-18.  The FDIC has wide-ranging
enforcement power over banks and bankers, and it exercises that authority to investigate
wrongdoing and ensure compliance with banking laws.  The Board of the FDIC is composed of
five members.  12 U.S.C. § 1812(a)(1).  Three of those members are appointed by the President to
fixed, six-year terms.  *Id.* § 1812(c)(1).  The remaining two directors are "dual hat" and *ex officio*
members of the Board.  They are the Comptroller of the Currency (the "Comptroller") and the
Director of the Consumer Financial Protection Bureau ("CFPB").  *See id.* § 1812(a)(1)(B)-(C).

19.    Defendant Martin J. Gruenberg ("Chairman Gruenberg") is a natural person who
currently serves as the Acting Chairman of the FDIC.

20.    Defendant Michael J. Hsu is a natural person who currently serves as the Acting
Comptroller and as an *ex officio* member of the board of directors of the FDIC.

21.    Defendant Rohit Chopra is a natural person who currently serves as Director of the
CFPB and as an *ex officio* member of the board of directors of the FDIC.

22.    Defendant Jennifer Whang is an Administrative Law Judge with OFIA.

## FACTS

**A.**    **The Expansive Powers of the Federal Deposit Insurance Corporation**

23.    Congress has authorized the FDIC to investigate banks and bankers and to enforce
a variety of federal banking laws and regulations.  The FDIC is empowered by the Federal Deposit

Insurance Act of 1950, as amended ("FDI Act"), to issue a "notice of charges" against an enforcement target, 12 U.S.C. § 1818(b)(1); to issue "cease-and-desist orders," *id.* § 1818(b)-(c); to conduct hearings, *id.* § 1818(h); to force banks to "correct conditions" resulting from violations of laws, *id.* § 1818(b)(6); and to levy significant civil monetary penalties for violations of applicable laws and regulations, *id.* § 1818(i)(2).

24.     The most severe sanctions that the FDIC can issue are "removal and prohibition" orders. 12 U.S.C. § 1818(e).  A removal order operates to remove its subject from the bank-related offices specified by the FDIC in that order (e.g., as a director of a bank).  *Id.* § 1818(e)(1)(C), 1818(e)(4).  Members of Congress have recognized that the FDIC's authority to order removal is as an "extraordinary power" that "can do great harm to the individual affected and to [his or her] institution and to the financial system as a whole."  S. Rep. 89-1482, at 6 (1966).  For this reason, Congress cautioned that the removal power "must be strictly limited and carefully guarded." *[Anonymous] v. FDIC*, 619 F. Supp. 866, 871 (D.D.C. 1985) (emphasis omitted) (citing S. Rep. 89-1482, at 8).  Prohibition orders, however, are even more draconian.  A prohibition order will operate to forever bar its subject from "participat[ing] in any manner in the conduct of the affairs of <u>any</u>" bank, absent the FDIC's future consent.  12 U.S.C. § 1818(e)(6) (emphasis added); *see id.* § 1818(e)(7).  As the FDIC has noted, the "sanction of prohibition is possibly the most severe permitted by banking law."  *In re Dibella*, No. FDIC-92-300e, 1994 WL 16012553 (FDIC Nov. 28, 1994).  In the banking industry, prohibition is colloquially known as the "death penalty."

25.     Section 8(e) of the FDI Act provides that, if the FDIC determines that a bank or its officer has "violated any law or regulation," engaged "in any unsafe or unsound practice," or otherwise breached a fiduciary duty, it may serve "a written notice [("Notice")] of the agency's intention to remove such party from office or to prohibit any further participation by such party,

in any manner, in the conduct of the affairs of any insured depository institution."  12 U.S.C. §§ 1818(e)(1)(A)(1)-(iii); 1818(e)(1)(A)(C); *see id.* § 1818(e)(5) (defining the "institution-affiliated part[ies]" against whom enforcement proceedings may be instituted).

26.     Congress has empowered the FDIC to seek a "civil monetary penalty" against an enforcement target.  *See* 12 U.S.C. § 1818(i).  Section 8(i) of the FDI Act provides that any banker who "breaches any fiduciary duty" shall "pay a civil penalty of not more than $25,000 for each day during which such . . . breach continues."  *Id.* §§ 1818(i)(2)(B)(i)(III), 1818(i)(2)(B)(ii)(III).

27.     When the FDIC issues a Notice to begin removal or prohibition proceedings, that Notice must both (1) "contain a statement of facts constituting grounds" for the charges and (2) "fix a time and place at which a hearing will be held thereon."  12 U.S.C. § 1818(e)(4).

28.     Upon the initiation of enforcement proceedings, the parties litigate in a "hearing" before an administrative law judge.  *See* 12 C.F.R. § 308.35; *see id.* § 308.5(a) (noting that adjudicative hearings at the FDIC "shall be conducted" by ALJs "in accordance with the provisions of" the Chapter 5 of the Administrative Procedure Act, 5 U.S.C §§ 500-596).

29.     After the hearing concludes, the ALJ prepares a "recommended decision" for presentation to the FDIC's Board, which will include both "recommended findings of fact" and "recommended conclusions of law."  12 C.F.R. §§ 308(b)(8), 308.38.  Parties may then file "exceptions" to the ALJ's recommended decision with the FDIC's "Administrative Officer."  *Id.* § 308.39. The Administrative Officer then refers the matter (including the  recommended decision and the parties' exceptions) "to the [FDIC] Board of Directors for final decision."  *Id.* § 308.40(a).

30.     At that point, the FDIC's Board may either (1) "render a final decision" or (2) "order[] that the action or any aspect thereof be remanded to the administrative law judge for further proceedings."  12 C.F.R. § 308.40(c)(2).[1]  If the FDIC "find[s] that any of the grounds specified in [the] notice have been established" based on its review of "the record made at [the] hearing," then the FDIC may issue orders of removal and/or prohibition.  12 U.S.C. § 1818(e)(4).

### B.      The Structure of the FDIC, OFIA, and their Administrative Law Judges

31.     The FDIC was created by the Banking Act of 1933.  *See* Pub. L. No. 73-66 § 12B(a), 48 Stat. 162, 168 (June 16 1933).  The creation of the FDIC was part of a "significant expansion[] of the administrative state" during the New Deal.  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 130 n.6 (2015) (Thomas, J., concurring).  The FDIC and similar New Deal agencies were developed by policymakers, including James Landis, who held a "deep disdain for the theory of popular sovereignty" and "belie[ved] that bureaucrats might more effectively govern the country than the American people."  *Id.*; *see Cochran*, 20 F.4th at 214-25 (Oldham, J., concurring).

32.     Federal law currently provides that the Board of Directors of the FDIC will have five members.  12 U.S.C. § 1812(a)(1).

33.     Three of those members are appointed by the President to fixed, six-year terms.  12 U.S.C. § 1812(c)(1).  The three appointed members of the FDIC are tenure-protected and may only be removed by the President for cause.  *See Weiner v. United States*, 357 U.S. 349, 352, 356 (1958) (equating fixed-length terms with for-cause removal protection); *PCAOB*, 561 U.S. at 487 (same).

34.     The remaining two FDIC directors are "dual hat" and *ex officio* members of the Board.  They are the Director of the CFPB and the Comptroller.  *See id.* § 1812(a)(1)(B)-(C).

35.     The CFPB was created by the Dodd-Frank Wall Street Reform and Consumer

---

[1] In some cases (e.g., in certain cases involving fraud), the ALJs used by the FDIC can render final decisions.

Protection Act of 2010 ("Dodd-Frank").  Section 1101 of Dodd-Frank provided that the CFPB would be headed by a single director appointed by the President, that this director was to "serve for a term of 5 years," and that the director could only be removed "for cause."  Pub. L. No. 111-203, tit. X, § 1101(c), 124 Stat. 1376, 1964 (July 21, 2010) (codified at 12 U.S.C. § 5491).  The Supreme Court held in *Seila Law* that the "structure of the CFPB violate[d] the separation of powers" because the CFPB Director did not serve at the pleasure of the President.  140 S. Ct. at 2192, 2209.  Since *Seila Law* was decided in 2020, the President has had the power to fire the CFPB Director at will.

36.     The President may remove the Comptroller at will.  *See* 12 U.S.C. § 2.

37.     Under current law, the President cannot remove a majority of the FDIC Board at will because three of its five members enjoy "for cause" protection.  *See supra* ¶ 33.  Prior to June 2020, four of the Board's five members (all except for the Comptroller) enjoyed "for cause" protection.  *See supra* ¶¶ 34-36.

38.     The FDIC participates in a unique "ALJ-sharing" arrangement.

39.     Section 916 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") required a specified group of "Federal banking agencies" to "jointly . . . establish their own pool of administrative law judges" and "develop a set of uniform rules and procedures for administrative hearings" before those judges.  Pub. L. No. 101-73 § 93, 103 Stat. 183, 486 (Aug. 9, 1989) (codified at 12 U.S.C. § 1818 note (1992)).

40.     After FIRREA was passed, a group of agencies with banking-related jurisdiction developed, through rulemakings, a common set of procedures governing the procedures to be used in administrative hearings.  Those agencies (the "Banking Agencies") included the FDIC, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve

System ("FRB"), and the National Credit Union Administration ("NCUA").  *See generally Uniform Rules of Practice and Procedure*, Final Rule, 56 Fed. Reg. 37,968 (FDIC Aug. 9, 1991).

41.     The Banking Agencies also executed a so-called "Interagency Administrative Law Judge Agreement" in May of 1991 (the "1991 OFIA Agreement"), a copy of which is attached hereto as Exhibit A.  Through the 1991 OFIA Agreement, the Banking Agencies purported to "create[]" a new entity called the "Office of Financial Institution Adjudication" ("OFIA").  Ex. A at 2 ¶ 1(e).  The 1991 OFIA Agreement further provides that the "administrative law judges" of OFIA "will be selected by mutual agreement among the [Banking] Agencies."  *Id.* at 2 ¶ 2(a).

42.     The Banking Agencies entered into an "Amended and Restated Administrative Law Judge Agreement" in July of 2011 (the "2011 OFIA Agreement"), a copy of which is attached hereto as Exhibit B.  The 2011 OFIA Agreement provided that the FDIC, in its capacity as the "host" agency for OFIA, "shall employ the administrative law judges of the [OFIA] Staff," but that "[a]ny change to the Office Staff personnel"—specifically including the OFIA ALJs—"shall be subject to the prior written approval of all [Banking] Agencies."  Ex. B at 3 ¶ 3; *see id.* at 8.

43.     The Banking Agencies entered into the "Administrative Law Judge Agreement of 2018" in December of 2017 (the "2018 OFIA Agreement"), a copy of which is attached hereto as Exhibit C.  The 2018 OFIA Agreement renewed the 2011 OFIA Agreement, the latter of which was set to expire at the end of 2017.  *See* Ex. C at 1 (final "whereas" clause).  The 2018 OFIA Agreement continues to provide that "[a]ny change to the Office Staff personnel shall be subject to the prior written approval of all [Banking] Agencies."  *Id.* at 3 ¶ 2; *see id.* at 7.

44.     The internal machinations of OFIA are so opaque that even the details of the arrangement above had to be gleaned from documents extracted from OFIA through Freedom of

Information Act requests.[2]  To the best of Burgess's knowledge, the 1991, 2011, and 2018 OFIA Agreements are not available on OFIA's website or from any other public source.

45.     OFIA describes itself as an "inter-agency group of administrative law judges" that is "host[ed]" by the FDIC.  *About Us*, Off. of Fin. Institution Adjudication, https://bit.ly/3UEwxfr (last visited October 6, 2022) ("OFIA Website"); *see* 56 Fed. Reg. at 37,977 (now codified at 12 C.F.R. § 308.3) (FDIC regulations defining the term "Office of Financial Institution Adjudication" to "mean[] the <u>executive body</u> charged with overseeing the administration and administrative enforcement proceedings" of the Banking Agencies (emphasis added)).  At present, OFIA "presides over administrative enforcement proceedings brought by" the FDIC, OCC, FRB, and NCUA, "and issues recommended decisions to the relevant agency head."  OFIA Website, *supra.* OFIA's website states that the "administrative operations of OFIA are governed by an interagency memorandum of understanding"—i.e., the 2018 OFIA Agreement—which "provide[s] for general oversight by an interagency committee and cost-sharing among the constituent agencies."  *Id.*

46.     There are currently two ALJs within OFIA: Jennifer Whang (a Defendant here) and Christopher McNeil ("ALJ McNeil").  ALJ Whang was appointed as an OFIA ALJ in 2019.[3]

47.     FDIC regulations provide that hearings "shall be held before an administrative law judge of the Office of Financial Institution Adjudication."  12 C.F.R. § 308.103(a).

48.     Pursuant to the FDIC's regulations, the "administrative law judge shall have all powers necessary to conduct a proceeding."  12 C.F.R. § 308.5(a).  The ALJs used by the FDIC have authority to issue subpoenas, rule on the admissibility of evidence, regulate hearings, rule on a variety of procedural and substantive motions, and "do all other things necessary and appropriate

---

[2] *Cf.* Brief of Petitioner at 29, *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022), ECF 26 (Apr. 7, 2021).

[3] On October 28, 2019, the FDIC's Board adopted a resolution "appoint[ing] Administrative Law Judge Jennifer Whang as an administrative law judge for the FDIC."  *See Resolution*, FDIC (Oct. 28, 2019), https://bit.ly/3r54Kaz. The following month, ALJ Whang was appointed as an ALJ for OCC.

to discharge the duties of a presiding officer." *Id.* §§ 308.5(b)(2), (3), (5), (7), (11).  As the Fifth Circuit explained in a published decision rendered at a prior stage of this case, the ALJs used by the FDIC "carry out important functions over which they exercise significant direction." *Burgess*, 871 F.3d at 302 (internal brackets, punctuation, and quotations omitted); *see id.* (discussing these ALJs' "broad authority to preside over agency adjudications and issue recommendations").

49.     Despite the significant executive authority that the ALJs used by the FDIC wield, they enjoy an extraordinary level of protection from removal.  Firing the ALJs used by the FDIC is an extremely cumbersome process.  First, all four of the Banking Agencies would need to unanimously concur, in writing, to the initiation of removal proceedings.  *See supra* ¶¶ 42-43. Assuming the Banking Agencies are fully staffed, initiating a removal proceeding would require separate sign-offs from at least 9 different people—the Comptroller, 3 of the 5 members of the FDIC Board (one of whom could be the Comptroller),[4] 4 of the 7 members of the FRB, and 2 of the 3 members of NCUA.

50.     Even then, the ALJ could not be fired unless at least 2 of the 3 members of the MSPB also found that there was cause to do so.  *See* 5 U.S.C. § 7521(a) (ALJs can be removed only for "good cause established and determined by the Merit Systems Protection Board").

51.     Ultimately, at least 11 different people would need to agree that it is appropriate to terminate an ALJ before that ALJ could be removed from office.

52.     But it gets worse.  The problem is not just that 11 people would need to sign off on the termination of the ALJ, but also that at least 9 of those people are themselves tenure-protected.

53.     All of the directors of the FRB and NCUA are tenure-protected and may only be

---

[4] The FDIC's bylaws require a majority vote before any action is taken.  FDIC Bylaws art. IV, § 6(d).  Initiating a removal proceeding against an ALJ would require 10 votes—1 from the Comptroller, 3 from the FDIC, 4 from the FRB, and 2 from NCUA.  But because the Comptroller could vote in two separate capacities (i.e., as both the head of OCC and as a member of the FDIC's Board), those 10 votes could technically be cast by as few as 9 people.

removed for cause.  *See* 12 U.S.C. § 242 (FRB); *id.* § 1752a(c) (NCUA).

54.     Similarly, the members of the MSPB can only be removed by the President for "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d); *see Long v. Social Security Admin.*, 635 F.3d 526, 534-35 (Fed. Cir. 2011).

55.     If the President wanted to remove an ALJ used by the FDIC but no one in the vast underlying administrative apparatus concurred with his or her view, the President would need to show cause to fire (1) the ALJ; (2) a majority of the MSPB; (3) at least one appointee to the FDIC Board[5]; (4) a majority of the Directors of the FRB; and (5) a majority of directors of NCUA.

56.     The graphic on the following page provides a basic visual description of the process that would be necessary to fire one of the ALJs used by the FDIC.  In the graphic, the stick figures in red represent officers who enjoy for-cause protection from removal, and the green check marks indicate the minimum number of votes that would be needed before an ALJ could be removed.  As the graphic confirms, the multi-stage procedure that is required to terminate an ALJ bears little resemblance to the unitary Executive department envisioned by the Founders, who designed a Constitution in which "the executive Power"—all of it—was vested in the President.  U.S. Const. art. II, § 1, cl. 1 (emphasis added).

---

[5] The President can remove the Comptroller and the CFPB Director from office at will, but would need to establish cause to remove any of the appointed FDIC directors (and ergo remove a majority).  If the President were unwilling to remove the Comptroller or the CFPB Director—which would be understandable, given that such removal would also remove them from heading their "home" agencies—he would need to fire three appointed FDIC Board members.



C.     **The FDIC's Enforcement Proceeding Against Burgess**

57.     In 2010, unelected bureaucrats at the FDIC began an investigation into Burgess's expense practices after receiving a false tip that he was using bank funds to renovate his house.

58.     From the beginning, the investigation was tainted by agency personnel's preconceived notions about Burgess.  On information and belief, the FDIC's investigators and staff were biased against Burgess because, among other things,

     i.     FDIC personnel wrongly blamed Burgess for damages suffered by Herring Bank as a result of a Ponzi scheme perpetrated by a non-party;

     ii.     FDIC personnel harbored politically motivated objections to some of the financial services and products that Herring Bank began providing under Burgess's leadership;

     iii.     FDIC personnel harbored politically motivated objections to some of the business relationships that Herring Bank entered into (or contemplated entering into) under Burgess's leadership, including relationships between Herring Bank and certain medical marijuana-related companies; and

     iv.     FDIC personnel disagreed with Burgess's managerial style, which some have described as being "dominating."

59.     Between 2010 and 2014, the FDIC conducted an unrelenting investigation of Burgess and Herring Bank.  The FDIC's inexplicable obsession with Burgess was so obvious and unusual that some staff within the FDIC described it as a "witch hunt."  Officials with the Texas Department of Banking seemed flabbergasted with the FDIC's conduct, and observed that FDIC staff was "a little too obsessed" with Burgess and Herring Bank and "may have hypothesized some scenarios that may or may not be factual."

60.     After almost four years of investigating, which imposed significant burdens on Burgess and bank staff, the FDIC formally opened the Enforcement Proceeding on November 21, 2014.  The Enforcement Proceeding is styled *In re Cornelius Campbell Burgess et al.* (Nos. FDIC-14-0307e, FDIC 140-0308k).

**61.**     FDIC Enforcement Counsel alleged in the Enforcement Proceeding that Burgess abused his positions at Herring Bank.  Enforcement Counsel sought to (1) remove Burgess from his positions at the bank and its holding company; (2) prohibit Burgess from further participation in the banking industry; and (3) assess a civil monetary penalty of $200,000 against Burgess.

**62.**     FDIC referred the Enforcement Proceeding to OFIA for a hearing.

**63.**     The Enforcement Proceeding was originally assigned to administrative law judge C. Richard Miserendino ("ALJ Miserendino"), who was then one of the ALJs in the OFIA "pool."

**64.**     Prior the first hearing, the Enforcement Proceeding was reassigned to ALJ McNeil.

**65.**     Beginning on September 13, 2016, a seven-day hearing before ALJ McNeil was held.  ALJ McNeil heard testimony from more than 20 fact witnesses.  During the hearing, one of the FDIC's own witnesses described Burgess as a "visionary [who] has excellent skills at setting strategic goals for the bank, locating acquisitions, and developing new products and services."

**66.**     On January 11, 2017, ALJ McNeil issued a Recommended Decision.  ALJ McNeil recommended that Burgess be removed from his bank-related positions, prohibited from ever working in the banking industry again, and assessed a $200,000 civil monetary penalty.  On May 26, 2017, the FDIC's Administrative Officer submitted the case for the Board's review.

**67.**     On August 7, 2017, the Board accepted ALJ McNeil's Recommended Decision and issued a final order of removal and prohibition.  The Board also assessed a $200,000 civil penalty.

**68.**     On August 25, 2017, Burgess filed a petition for review of the FDIC's decision with the United States Court of Appeals for the Fifth Circuit.  Later the same say, Burgess filed a motion to stay the FDIC's final order pending disposition of his petition for review.  Burgess argued, among other things, that a stay was appropriate because ALJ McNeil was an "inferior Officer" of the United States who had not been validly appointed under the Appointments Clause.

69.     On September 7, 2017, the Fifth Circuit issued a published Order that stayed the Board's decision.  The Fifth Circuit granted the stay because it determined that Burgess was likely to succeed on the merits of his Appointments Clause argument.  *Burgess*, 871 F.3d at 302.

70.     On June 21, 2018, the Supreme Court issued its Opinion in *Lucia*, which definitively confirmed that ALJs are inferior officers of the United States.  138 S. Ct. at 2055.

71.     In the aftermath of *Lucia*, the Board realized that the ALJs it used to conduct its enforcement proceeding were inferior officers of the United States and therefore could only serve if they were formally appointed by the President, the head of an agency, or a court of law.  *Cf. Lucia*, 138 S. Ct. at 2051.  Therefore, the full Board issued a resolution appointing ALJ McNeil and ALJ Miserendino as FDIC ALJs on July 19, 2018.

72.     On August 20, 2018, the Fifth Circuit remanded the Enforcement Proceeding back to the FDIC for further proceedings in light of *Lucia*.

73.     On remand, the Board reassigned responsibility for conducting the Enforcement Proceeding from ALJ McNeil back to ALJ Miserendino.

74.     On October 28, 2019, the FDIC Board issued Resolution (Seal No. 087176) that appointed ALJ Whang as an administrative law judge for the FDIC.

75.     On November 26, 2019, the Executive Secretary of the FDIC reassigned the Enforcement Proceeding from ALJ Miserendino (who had recently retired) to ALJ Whang.

76.     A three-day supplemental hearing before ALJ Whang was held in January 2022.

77.     On September 16, 2022, ALJ Whang issued a Recommended Decision.  ALJ Whang recommended that Burgess be removed from his bank-related offices, be prohibited from further participation in the banking industry, and be assessed a civil monetary penalty of $200,000.

78.     Burgess intends to file timely exceptions to ALJ Whang's Recommended Decision. Those exceptions are due on or before October 17, 2022.  At any time after the exceptions are filed, the Board could render a "Final Decision" and impose sanctions on Burgess (e.g., removal, prohibition, monetary penalties) that would be immediately effective, absent a discretionary stay. *See supra* ¶ 30.  The Board must render a Final Decision within 90 days after the case is submitted for its review (except in the rare cases in which the Board allows oral argument, in which case it must render a Final Decision within 90 days after oral argument).  12 C.F.R § 308.40(c)(2).

79.     The Board can, and often does, render a Final Decision sooner than 90 days after the case is submitted for its review.  For example, the Board issued its 2017 Final Decision in Burgess's case only 74 days after the FDIC's Administrative Officer submitted that case for the Board's review.  *See supra* ¶¶ 66-67.  The FDIC Board recently requested a copy of the official administrative record from OFIA on October 4, 2022 (even before the parties' exceptions to the Recommended Decision are due), which signals the agency's intent to render a Final Decision expeditiously.

### STANDING

80.     Burgess has Article III standing to pursue the claims in this Complaint.

81.     "To establish Article III standing, a plaintiff must show" that he [1] "has suffered an 'injury in fact' that is [2] 'fairly traceable' to the defendant's conduct and [3] would likely be 'redressed by a favorable decision.'"  *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61 (1992)).

82.     With respect to the injury-in-fact requirement, Burgess has suffered, is suffering, and will continue to suffer an injury in fact as a result of the Defendants' conduct.

83.     Being forced to endure agency proceedings conducted by officers who have unconstitutional protections from removal is itself an injury of constitutional dimension.  That is

so because separation-of-powers problems related to the exercise of executive authority over a citizen create a "here-and-now" injury that is ripe as soon as that executive power is exercised (or as soon as its exercise is imminent). *Bowsher v. Synar*, 478 U.S. 714, 728 n.5 (1986); *see Seila Law*, 140 S. Ct. at 2196 ("[P]rivate parties aggrieved by an official's exercise of executive power are permitted to challenge the official's authority to wield that power while insulated from removal by the President."). Parties such as Burgess are clearly "entitled to declaratory relief sufficient to ensure that the [legal] standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *PCAOB*, 561 U.S. at 513; *accord Seila Law*, 140 S. Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." (quoting *Bowsher*, 478 U.S. at 721)); *Cochran*, 20 F.4th at 244 (Oldham, J., concurring) ("A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding."); *see id.* at 233 (noting that a lawsuit of the type bought here "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an agency's "unimpeded control over the way it investigates and proceeds against its targets").

84.     The Enforcement Proceeding has inflicted, and is continuing to inflict, significant reputational injuries on Burgess. The ALJs used by the FDIC have twice issued Recommended Decisions finding that Burgess committed serious misconduct; the first of those decisions was affirmed by the FDIC, and the second may imminently be affirmed by the FDIC absent this Court's intervention. These reputational injuries are injuries-in-fact for purposes of Article III standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("reputational harms" are sufficient to constitute an injury for purposes of Article III standing); *Meese v. Keene*, 481 U.S. 465, 473-75

(1987) (plaintiff had standing to challenge government action that "would adversely affect his reputation in the community"); *Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014) ("[I]njury to one's reputation can be a cognizable injury-in-fact to confer standing to bring suit."); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 220 (3d Cir. 2013) ("[R]eputational harm is a cognizable injury in fact."), *abrogated on other grounds sub. nom Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

85.     Moreover, Burgess has incurred hundreds of thousands of dollars in legal fees, and wasted an enormous amount of time, defending against the unconstitutional Enforcement Proceeding.  This type of "pocketbook injury is a prototypical form of injury in fact." *Collins*, 141 S. Ct. at 1779; *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").

86.     Burgess has been denied his Seventh Amendment right to a jury trial, which is a structural error that plainly constitutes an injury in fact.  Moreover, if this Court were to agree that Burgess is entitled to a trial by jury, all expenses he has already incurred in defending against the Enforcement Proceeding, plus the expenses he will incur in connection with the same in the time period before the FDIC issues a Final Decision, will have been a waste, because the agency will be required to begin its Enforcement Proceeding again in federal court.

87.     Absent this Court's intervention, the FDIC will imminently take action on ALJ Whang's Recommended Decision, which is likely to result in a Final Order imposing the sanctions of prohibition, removal, and civil monetary penalties on Burgess.  *See supra* ¶ 78.  Those sanctions will be extraordinarily harmful to Burgess, *see supra* ¶ 24, and constitute clear injuries in fact. During a prior stage of this very case, the Fifth Circuit held that the FDIC's actions posed a significant "personal harm" to Burgess himself and to Herring Bank, "which values [Burgess's]

ongoing participation on [its] board." *Burgess*, 871 F.3d at 304; *see id.* (crediting Burgess's arguments that the FDIC's Enforcement Proceeding threatened to "destruct[]" his "career in his chosen profession of banking" and that the FDIC's "constitutionally infirm hearing . . . injured [his] reputation and ability to procure comparable employment" (internal quotation marks and ellipsis omitted)).

88.     There is a causal connection between Burgess's injuries and Defendants' conduct. All of Burgess's injuries are attributable to and were inflicted by the Defendants, and there is a clear causal connection between the Defendants' unlawful exercise of executive power over Burgess and the injuries he has suffered as a result of the Enforcement Proceeding.  Had the Defendants never initiated the Enforcement Proceeding, Burgess would not have suffered the financial and reputational injuries discussed above, and would not have been forced to endure the harm of suffering through an unconstitutional agency proceeding. *See Collins*, 141 S. Ct. at 1779.

89.     Burgess's injuries in fact are redressable through this lawsuit because this Court can and should declare that (1) the structure of the FDIC and the removal protections for FDIC Directors and the ALJs used by the FDIC violate the separation of powers and that (2) Burgess is entitled to a jury trial.  Moreover, this Court can and should enjoin the continuation of the Enforcement Proceeding.  That relief would terminate Burgess's injury of being exposed to an unlawful agency proceeding and terminate the related injuries associated with the ongoing expense of that proceeding.  Such relief would also prevent future imminent injuries that will be inflicted by the FDIC, such as issuing a Final Order imposing the sanctions of removal, prohibition, or civil monetary penalties.

## CLAIMS FOR RELIEF

### Count 1 (Declaratory Relief):  The FDIC Is Unconstitutionally Structured

90.     Burgess incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

91.     The Constitution vests "the executive Power" in the President.  U.S. Const. art. II, § 1, cl. 1.  And, as James Madison explained at the First Congress, "if any power whatsoever is in its nature Executive, it is the power" of "overseeing" and "controlling those who execute the laws." 1 Annals of Cong. 463 (1789).  Since the Founding, it has been understood that the "executive power" granted to the President in Article II "include[s] a power to oversee executive officers through removal."  *PCAOB*, 561 U.S. at 492; *see* Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1023 (2006) (discussing the "Decision of 1789," in which "the first Congress concluded that the Constitution's grant of executive power authorized the President to remove executive officers").

92.     The Take Care Clause of the Constitution provides that the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "guarantees the President a certain degree of control over executive officers," and reflects the Founders' belief that the "President must have adequate power over officers' . . . removal" because "[o]nly then can the People, to whom the President is directly accountable, vicariously exercise authority over high-ranking executive officials."  *Jarkesy*, 34 F.4th at 463.

93.     Limits on the President's authority to remove <u>principal</u> executive officers such as agency heads have been viewed by the Supreme Court with particular disfavor.  *See Seila Law*, 140 S. Ct. at 2197-2200.  Because principal officers direct the policy for all inferior agency personnel, it is especially important that they be accountable to the President.  Thus, with respect to principal officers specifically, the Supreme Court confirmed in *Seila Law* that the one and only

"exception[]" to the President's otherwise "unrestricted removal power" applies to "multimember expert agencies <u>that do not wield substantial executive power</u>." *Id.* at 2199-2200 (emphasis added). In that case alone, Congress may grant for-cause removal protections to principal officers.

94.    Thus, the operative questions for determining the constitutionality of removal protections for "officers of the United States" are (1) whether the officers are principal, as opposed to inferior; and (2) whether the agency "wield[s] substantial executive power." If the answers to both of those questions are yes, the President must be able to fire the agency heads at will.

95.    The FDIC's Board fails this test.

96.    The directors of the FDIC are principal officers because the five-member Board is the head of the agency. *See* 12 U.S.C. § 1812(a)(1).

97.    Moreover, the FDIC plainly "wields substantial executive power." Indeed, the FDIC has a frightening arsenal of executive powers, many of which closely resemble the classic examples of executive power detailed in the Supreme Court's *Seila Law* decision. For example,

     i.    The FDIC can unilaterally conduct administrative hearings, 12 U.S.C. § 1818, just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200;

    ii.    The FDIC can issue rules interpreting its enabling statutes, 12 U.S.C. § 1828, just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200; and

   iii.    The FDIC can seek (and here, has sought) to impose significant civil monetary penalties against a regulated party, 12 U.S.C. § 1818(i), just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200.

98.    Because the FDIC's directors are "principal" officers who serve as the head of an agency that "wield[s] substantial executive power," it would be unconstitutional for Congress to provide for-cause removal protections for members of the FDIC Board. But that is exactly what Congress did in 12 U.S.C. § 1812(c)(1). *See supra* ¶ 33. That statute is therefore unconstitutional. *See Kelley v. Azar*, No. 4:20-cv-00283, 2021 WL 4025804, at *14 (N.D. Tex. Feb. 25, 2021)

(O'Connor, J.) ("Pursuant to [the] fundamental principle of the separation of powers, Congress may not create independent agencies wielding substantial executive power that are insulated from all Presidential control." (citing *Seila Law*, 140 S. Ct. at 2199)); *see also* Cass R. Sunstein & Adrian Vermeule, *The Unitary Executive: Past, Present, Future*, 2020 Sup. Ct. Rev. 83, 85 (2020) (noting that *Seila Law* casts "grave doubt" over the legality of removal protections applicable to "independent agencies with multiple heads," such as the FDIC).[6]

**99.**    Burgess is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that the FDIC is an unconstitutionally structured agency.

**100.**    Burgess is entitled to an injunction barring the FDIC and its Directors from proceeding in any way with the Enforcement Proceeding, including by issuing a final decision in the Enforcement Proceeding or taking any other action contemplated by 12 C.F.R. § 308.40(c)(2).

**101.**    The Supreme Court confirmed in *Seila Law* that "private parties aggrieved by an official's exercise of executive power" are permitted "to challenge the official's authority to wield that power while insulated from removal by the President."  140 S. Ct. at 2196; *see Collins*, 141 S. Ct. at 1780 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").  In such cases, the plaintiff has "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles."  *PCAOB*, 561 U.S. at 491 n.2.

---

[6] *Accord* Br. of Washington Legal Foundation as *Amicus Curiae* at 28, *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022), 2021 WL 1522018, at *28 (Apr. 9, 2021) (*Seila Law* means that the "President must be able to remove FDIC directors at-will"); Adam C. Gillette, *Form Over Function: How* Collins v. Yellen *Signals a Threat to the Independence of Multimember Financial Regulatory Agencies*, 26 N.C. Banking Inst. 109, 114, 131 (2022) (suggesting that removal protections for the FDIC's appointed directors are unconstitutional under *Seila Law*); Samuel Rubinstein, *Chairpointment: Rethinking the Appointment of Independent Agency Chairpersons*, Harv. J. on Leg. Online (2020) (same); *see also* Aaron L. Nielson, *Is the FTC on a Collision Course with the Unitary Executive?*, Yale J. on Reg. Notice & Comment (noting that, under "*Collins and Seila Law*," the directors of "[m]ulti-headed independent agencies" such as the FDIC are on notice that "their removal protections . . . conflict[] with the Supreme Court's current understanding of the separation of powers"); *supra* ¶ 105 n.8 (discussing the *Consumers' Research* case).

**102.** Through this lawsuit, Burgess is seeking <u>prospective</u> relief. Burgess's exceptions to ALJ Whang's Recommended Decision are due on or before October 17, 2022. At any time after those exceptions are filed, the FDIC—acting through Defendants Chairman Gruenberg, Director Hsu, and Director Chopra—could overrule Burgess's exceptions, accept ALJ Whang's Recommended Decision in whole or in part, and then issue a Final Decision that imposes removal sanctions, prohibition sanctions, and/or a civil monetary penalty. 12 C.F.R. § 308.40(c)(2). Any of those future actions would be unconstitutional because they would each constitute the exercise of executive authority by principal officers who have unlawful protection from removal.

**103.** In *Collins*, the Supreme Court addressed the appropriate remedy when a plaintiff has been exposed to administrative action from an officer who enjoyed an unconstitutional level of removal protections. In that case, the plaintiffs "no longer [had] a live claim for <u>prospective</u> relief," and the "only remaining remedial question concern[ed] <u>retrospective</u> relief." 141 S. Ct. at 1787 (emphasis added). The Court held that, in order to establish an entitlement to retrospective relief for a constitutional problem relating to removability protections, the plaintiff must show a "compensable harm." *Id.* at 1789. For example, if the President had "attempted to remove a Director but was prevented from doing so," that would be a "compensable harm." *Id.*

**104.** This case differs materially from *Collins* because here Burgess is requesting <u>prospective</u> relief. Absent this Court's intervention, Burgess will continue to be subjected to the exercise of executive power by the FDIC.[7] Burgess is not seeking through this lawsuit to retrospectively "unwind" anything that the FDIC has already done; instead, he is seeking to:

       i.      prospectively block the FDIC from continuing the Enforcement Proceeding; and

---

[7] The FDIC's regulations provide that if a "collateral attack is brought in any court concerning all or any part of an adjudicatory proceeding, the challenged adjudicatory proceeding shall continue without regard to the pendency of that court proceeding." 12 C.F.R. § 308.17. Thus, unless this court orders near-term relief, the Administrative Proceeding will continue unabated, and Burgess's right to a constitutional administrative process will be infringed.

ii.      prospectively block the FDIC from exercising any executive power (by, e.g., issuing a Final Decision in the Enforcement Proceeding).

**105.**    The Fifth Circuit's recent en banc decision in *Cochran* confirms that "*Collins* does not impact" the remedial analysis when, as here, the plaintiff "does not seek to 'void' the acts of any [agency] official" but instead merely "seeks an administrative adjudication untainted by separation-of-powers violations."  20 F.4th at 210 n.16.  As Judge Oldham explained in his concurring opinion for six Judges in *Cochran*, "[a] person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding."  *Id.* at 233 (Oldham, J., concurring); *see PCAOB*, 561 U.S. at 51 (explaining that plaintiffs are "entitled to declaratory relief sufficient to ensure that the . . . standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive").  Judge Oldham noted in his *Cochran* concurrence that, "[a]fter *Collins*," a declaratory-judgment lawsuit of the type Burgess has filed today "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an agency's "unimpeded control over the way it investigates and proceeds against its targets."  20 F.4th at 233 (Oldham, J., concurring).[8]

---

[8] For this reason, district courts within the Fifth Circuit have not hesitated to grant relief in cases where plaintiffs have presented constitutional claims akin to those presented here.  *Consumers' Research v. Consumer Product Safety Commission* is particularly instructive.  No. 6:21-cv-256, 2022 WL 1577222 (E.D. Tex. Mar. 18, 2022), *appeal docketed* (5th Cir. No. 22-40328).  In that case, plaintiffs raised removability concerns about the members of the Consumer Product Safety Commission, and sought an injunction to block them from enforcing, in the future, an agency rule concerning new fees for document requests.  Judge Kernodle granted the Plaintiffs' requested declaratory judgment, reasoning that "*Collins* applies to requests for retrospective relief, not the purely prospective relief Plaintiffs seek."  *Id.* at *12; *see id.* at *5 (noting that "[s]ubjecting Plaintiffs to . . . regulation in the alleged absence of Article II oversight directly injures Plaintiffs" and noting that *Cochran* "recogniz[ed] a standalone injury creating a right to seek 'redress for the injury of having to appear before' a constitutionally suspect agency" (quoting *Cochran*, 20 F.4th at 209)); *see also id.* at *13 ("*Collins* does not apply to plaintiffs seeking prospective relief.").

## Count 2 (Declaratory Relief): The ALJs Used by the
## FDIC Are Unconstitutionally Shielded from Removal

**106.** Burgess incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**107.** In recent years, the runaway expansion of the administrative state has been enabled in large part by the exercise of significant executive power by inferior executive officers—like the ALJs used by the FDIC—who enjoy a "Matryoshka doll of tenure protections" and are unburdened by any meaningful oversight from, or accountability to, the President. *PCAOB*, 561 U.S. at 497.

**108.** In *PCAOB*, the Supreme Court held that a scheme in which an inferior officer of the United States enjoys two layers of for-cause removal protection violates the Take Care Clause and offends fundamental separation-of-powers principles. 561 U.S. at 498; *see id.* at 492, 496 (multiple levels of tenure protection for inferior officers are "contrary to Article II's vesting of executive power in the President" and therefore "contravene the Constitution's separation of powers"). Applying that rule to the facts of the case, the Supreme Court held that the members of the PCAOB enjoyed an unconstitutional level of protection from removal because they could only be removed for cause by the Commissioners of the SEC, who themselves could only be removed for cause by the President. *Id.* at 492.

**109.** Footnote 10 of the *PCAOB* Opinion explicitly indicated that the Supreme Court was <u>not</u> reaching the question of how its holding would apply to "agency employees who serve as administrative law judges," for the stated reason that "[w]hether administrative law judges are necessarily 'Officers of the United States'" was at that time "disputed." 561 U.S. at 507 n.10.

**110.** In 2018, the Supreme Court decided *Lucia*, which squarely addressed the question the Court had left unanswered in footnote 10 of *PCAOB*. In *Lucia*, the Court held that SEC ALJs

are inferior officers of the United States and therefore must be appointed by either the President or the head of an agency. 138 S. Ct. at 2055.

111.  Under *Lucia*, the ALJs used by the FDIC, including Defendant ALJ Whang, are "inferior officers of the United States." If further confirmation were needed, the Fifth Circuit indicated in a published Order at a prior stage of this very case that the duties of the ALJs used by the FDIC are "sufficiently important, and their discretion sufficiently significant, to render them Officers" rather than "mere employees" for purposes of the Appointments Clause. *Burgess*, 871 F.3d at 303 (emphasis added).

112.  Under *PCAOB*, it is unconstitutional for an inferior officer of the United States to enjoy "double for-cause removal protection." As the Supreme Court in *PCAOB* explained, there are grave constitutional defects with a system in which "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over" an inferior officer, such as an ALJ. 561 U.S. at 496.

113.  In its recent decision in *Jarkesy v. SEC*, the Fifth Circuit explained that these two principles of law meant that the removal restrictions for SEC ALJs were unconstitutional. 34 F.4th at 465. In so holding, the panel accepted the Petitioner's "straightforward" argument:

    i.    "SEC ALJs are inferior officers" under *Lucia*;

    ii.    "SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under [*PCAOB*]"; and therefore

    iii.    the "statutory removal restrictions" for SEC ALJs "are unconstitutional."

*Id.* at 464-65. *Jarkesy* is binding, on-point authority that controls this case.[9] There is no material legal difference between the SEC ALJs at issue in *Jarkesy* and the ALJs used by the FDIC:  In

---

[9] Indeed, the ALJ adjudicating Burgess's Enforcement Proceeding seemed to recognize as much.  ALJ Whang's Recommended Decision acknowledged *Jarkesy*, but did not even attempt to distinguish that case; instead, she noted

both schemes, the ALJs can only be removed for cause following a determination made by the MSPB.  In fact, the constitutional defect tainting the ALJs used by the FDIC is vastly <u>more</u> problematic than the defect at issue in *Jarkesy*.  That is so because a proceeding to remove one of the ALJs used by the FDIC cannot even be initiated by the FDIC's Board unilaterally; instead, all four of the Banking Agencies must all agree to initiate a removal action.  *See supra* ¶¶ 42-43, 49.

114.    Because the ALJs used by the FDIC are inferior officers of the United States who enjoy double for-cause removal protection, it is unconstitutional for them to act as adjudicators in administrative enforcement proceedings.  *See Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring) ("Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what [*PCAOB*] interpreted the Constitution to forbid.").  Indeed, the United States previously conceded as much in *Lucia*.  *See* Br. for the United States at 47, *Lucia v. SEC*, 138 S. Ct. 2044 (No. 17-130), 2018 WL 1251862 (Feb. 21, 2018) ("Agency heads must be able to remove ALJs . . . . Otherwise, the agency head would be effectively in the same position as the Commission in [*PCAOB*]:  The agency head would not [be] responsible for the [ALJ's] actions, and would instead be responsible only for deciding whether to initiate a removal action in light of the MSPB's standards." (internal quotation marks omitted)).

115.    Burgess is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that the ALJs used by the FDIC enjoy an unconstitutional level of protection from removal.

116.    Absent this Court's intervention, Burgess will continue to be subjected to the exercise of executive power by ALJ Whang.

---

that the Fifth Circuit's published decision in *Jarkesy* was, in her opinion, "in tension" with a separate Ninth Circuit precedent that she apparently viewed as being more persuasive.

117.    Burgess is not seeking through this lawsuit to retrospectively "unwind" anything that ALJ Whang has already done; instead, he is seeking to:

> iii.    <u>prospectively</u> block ALJ Whang and the FDIC from continuing the Administrative Proceeding;

> iv.    <u>prospectively</u> block the FDIC from accepting ALJ Whang's Recommended Decision in whole or in part, given that the Recommended Decision was the product of an inferior officer whose service was unconstitutional; and

> v.    otherwise <u>prospectively</u> block the continued exercise of executive power by ALJ Whang, as would occur if, for example, the FDIC remanded the matter back to ALJ Whang for further proceedings.  *See* 12 C.F.R. § 308.40(c)(2).

118.    Burgess is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that he is entitled to a constitutionally structured proceeding on a going-forward basis.

### Count 3 (Declaratory Relief): The FDIC Unconstitutionally Deprived Burgess of His Right to a Jury Trial

119.    Burgess incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

120.    The Founders described the right to a trial by jury as "the heart and lungs of liberty"[10] and as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."[11]  The Supreme Court has aptly described jury trials as "fundamental" to the American legal system and as "one of our most vital barriers to "governmental arbitrariness." *Reid v. Covert*, 354 U.S. 1, 9-10 (1957).

121.    "Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the time of the Founding that the Constitution likely would not

---

[10] *The Revolutionary Writings of John Adams* 55 (C. Bradley Thompson ed., 2000).

[11] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in The Papers of Thomas Jefferson* 267 (Julian P. Boyd ed., 1958).

have been ratified absent assurance that the institution would be protected expressly by amendment." *Jarkesy*, 34 F.4th at 451-52. The Supreme Court has repeatedly confirmed that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence" that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

122.    The Seventh Amendment to the United States Constitution provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

123.    In *Tull v. United States*, the Supreme Court construed the Seventh Amendment "to require a jury trial on the merits in those actions that are analogous to 'Suits at common law'" because, "[p]rior to the Amendment's adoption, a jury trial was customary in suits brought in the English <u>law</u> courts." 481 U.S. 412, 417-18 (1987) (emphasis altered). *Tull* confirmed that the fact that the cause of action giving rise to the dispute was "created by congressional enactment" does not mean that no jury trial is required; instead, the operative question is whether the "statutory action is . . . <u>similar to</u> cases that were tried in courts of law." *Id.* (emphasis added); *see Jarkesy*, 34 F.4th at 452 (noting that the term "Suits at common law" can "include suits brought under a statute as long as the suit seeks common-law-like legal remedies"). And *Tull* instructed that, in determining whether a statutory action is "similar to cases that were tried in courts of law," a court should "examine both the nature of the action and of the remedy sought." 481 U.S. at 417.

124.    All of that said, the Supreme Court has held that Congress may assign the adjudication of certain disputes to agencies instead of juries in a limited set of cases that implicate "public rights." "[I]n cases in which 'public rights' are being litigated"—for example, in "cases

in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact"—the "Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977). The Supreme Court "refined" the concept of "public rights" in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where it held that "Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns 'traditional legal claims' to an administrative tribunal." *Jarkesy*, 34 F. 4th at 452 (quoting *Granfinanciera*, 492 U.S. at 52).

125.    The Fifth Circuit's recent decision in *Jarkesy* clarified that the inquiry to determine whether an adjudication must be handled by a jury moves in "two stages":

> First, a court must determine whether an action's claims arise "at common law" under the Seventh Amendment. Second, if the action involves common-law claims, a court must determine whether the Supreme Court's public-rights cases nonetheless permit Congress to assign it to agency adjudication without a jury trial. . . . [T]he relevant considerations include: (1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem; and (2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute.

*Jarkesy*, 34 F.4th at 453 (emphasis added; internal citations, brackets, and punctuation omitted).

126.    The *Jarkesy* Court then went on to apply that test to the facts of the case at bar. The Petitioner in *Jarkesy* had been the target of an SEC enforcement proceeding in which the agency alleged that the Petitioner had committed securities fraud and sought various remedies against him, including substantial civil penalties. *Jarkesy*, 34 F.4th at 449-50. On appeal, Mr. Jarkesy argued that the SEC enforcement proceeding deprived him of his constitutional right to a trial by jury.

**127.**     The *Jarkesy* panel began its analysis of that claim with the first question outlined above—i.e., whether the cause of action arose at common law.  The *Jarkesy* court held that the cause of action against Mr. Jarkesy <u>did</u> arise at common law because a "civil penalty was a type of remedy at common law that could only be enforced in courts of law."  *Id.* at 453-54.

**128.**     As to the second question—i.e., whether the Supreme Court's "public rights" cases permitted the SEC to proceed with an adjudication that did not include a jury—the *Jarkesy* panel held that they did not.  The panel concluded that (1) "[s]ecurities fraud actions are not new actions unknown to the common law" and that (2) "[j]ury trial in securities fraud suits would not dismantle the statutory scheme" or "impede swift resolution of the SEC's fraud prosecutions."  *Id.* at 455 (internal quotation marks omitted).

**129.**     Because Mr. Jarkesy was entitled to a trial by jury, the Fifth Circuit ordered the entirety of the SEC's enforcement proceeding against him to be "vacated."  34 F.4th at 459.

**130.**     This case is on all fours with *Jarkesy*.  Burgess was entitled to a trial on the FDIC's allegations against him, and therefore the Enforcement Proceeding was unconstitutional.

**131.**     The first question under the *Jarkesy* test is whether "an action's claims arise 'at common law' under the Seventh Amendment."  *Jarkesy*, 34 F.4th at 453.  The FDIC's claims against Burgess, while nominally statutory, do arise at common law.  That is so because the FDIC is seeking a civil monetary penalty against Burgess.  *See supra* ¶¶ 61, 77.  *Jarkesy* clearly held that the "Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties."  34 F.4th at 453.  *Jarkesy* reached that holding based on the fact that *Tull* had established a bright-line rule that actions for civil penalties under a statute are actions "at common law" for Seventh Amendment purposes, given that such actions are analogous to common-law actions for debt.  *See Tull*, 481 U.S. at 422 ("A civil penalty was a type of remedy at common law that could

only be enforced in courts of law.  Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity.").

132.    Moreover, claims where a plaintiff seeks to recover civil money penalties stemming from alleged breaches of fiduciary duties are among the types of claims that would have been adjudicated in an eighteenth-century English court of law.  *See, e.g.*, *In re Hooper*, 112 B.R. 1009, 1012 (B.A.P. 9th Cir. 1990) ("[A]n action to recover money damages for . . .  breach of fiduciary duty . . . was the type of action that would have been brought in a court of law in the courts of England prior to the merger of law and equity."); *accord In re Thrall*, 196 B.R. 959, 970 (Bankr. D. Colo. 1996); *Jarkesy*, 34 F.4th at 454 (noting that "actions seeking civil penalties are akin to special types of actions in debt from early in our nation's history which were distinctly legal claims" that "could only be enforced in courts of law" (internal quotation marks omitted)).

133.    The second question under the *Jarkesy* test is whether the Supreme Court's public-rights cases "permit Congress to assign" the proceeding "to agency adjudication without a jury trial."  *Jarkesy*, 34 F.4th at 453.  The relevant subsidiary "considerations include: (1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem;" and "(2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute."  *Id.*

134.    One of the FDIC's chief allegations in the Enforcement Proceeding is that Burgess breached his fiduciary duties to Herring Bank as a result of his purportedly improper expense practices.  Indeed, the chief statute invoked during the Enforcement Proceeding was Section 8 of the FDI Act, which provides that prohibition and/or removal may be appropriate when a banker

"has, directly or indirectly . . . committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." 12 U.S.C. § 1818(e)(1)(A) (emphasis added). ALJ Whang's Recommended Decision found that Burgess "breached his fiduciary duty of loyalty by using Bank resources for personal gain" and that he breached his fiduciary duties of candor and care by "fail[ing] to adequately document his business expenses."

135.    Actions seeking remedies for breaches of fiduciary duties were not invented by the American Congress, but rather have been known at common law for centuries. *See* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1013-16 (2011). Indeed, ALJ Whang noted in her Recommended Decision that the alleged "self-dealing" in which Burgess engaged was "a serious breach of [a] common law fiduciary duty." Similarly, the remedy of civil money damages was clearly known at common law. *See supra* ¶¶ 131-132.

136.    The use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Burgess would not "dismantle the statutory scheme." *Jarkesy*, 34 F.4th at 453. When applying this factor, one critical consideration for the court's attention is whether the claims at issue are of "the sort . . . uniquely suited for agency adjudication." *Id.* at 456. Claims alleging entitlement to money damages for breaches of common-law duties do not fit that bill because, just as with the securities-law claims at issue in *Jarkesy*, "federal courts have dealt with actions" of this type "for many decades." *Id.* Indeed, claims involving requests for civil monetary penalties and breaches of fiduciary duties are heard every day by federal courts sitting in diversity and by federal courts adjudicating liability under various state and federal statutory schemes.

137.    The FDIC is no stranger to jury-eligible proceedings, given that several of its enabling statutes allow it to bring cases in federal court against bank officials accused of various forms of misconduct—an authority it has often recently invoked. *See, e.g.*, 12 U.S.C. § 1821(k)

(bankers may be held liable "for monetary damages in any civil action by, on behalf of, or at the request or direction of the [FDIC]").  The FDIC can also pursue offensive claims against regulated parties under state common law.  Indeed, outside the context of removal and prohibition proceedings, the FDIC has often brought claims in federal court that seek money damages based on alleged breaches of common law fiduciary duties by bank officers—i.e., exactly the sorts of claims at issue in Burgess's Enforcement Proceeding.  *See FDIC v. Dee*, 222 F. Supp. 3d 972, 1031 (D.N.M. 2016); *FDIC v. Ching*, No. 2:13-cv-01710, 2016 WL 1756913, at *1 (E.D. Cal. May 3, 2016); *FDIC v. Dodson*, No. 4:13-cv-416, 2015 WL 7769520, at *1 (N.D. Fla. Sept. 25, 2015); *FDIC v. Schuchmann*, 235 F.3d 1217, 1221 (10th Cir. 2000); *FDIC v. Canfield*, 967 F.2d 443, 451 n.7 (10th Cir. 1992) (Moore, J., dissenting) (noting that "FDIC complaints" under 12 U.S.C. § 1821(k) "typically set forth claims of . . . breach of fiduciary duty").

**138.**    It also bears mention that Burgess does not contend here that <u>all</u> FDIC enforcement proceedings must proceed via jury trials in federal court, but rather that a small sub-class of those proceedings (i.e., those where the FDIC seeks civil monetary penalties) must be tried before a jury (assuming that the enforcement target elects a jury trial).  Burgess expresses no view, and this Court need not decide, whether a jury right would attach when the FDIC's enforcement action does not seek civil penalties.  Burgess is asking only that a sub-set of the FDIC's enforcement proceedings, including the one against him, be tried before a jury.  There would be no disruptive consequences if this Court were to order that narrow form of relief.[12]

---

[12] In any event, the Supreme Court confirmed in *Granfinanciera* that consideration of whether a jury trial would "dismantle the statutory scheme" would be most probative in cases where there was evidence that Congress "ha[d] given careful consideration to the constitutionality" of it routing certain classes of disputes away from juries, and would be less probative in cases where there was "no evidence that Congress considered the constitutional implications" of its decision.  492 U.S. at 2800.  Here, there is no evidence that Congress gave any consideration to the constitutionality of routing FDIC enforcement actions away from juries, and its decision to do so (first made in 1966) far pre-dated the Supreme Court's subsequent creation and refinement of the "public rights" doctrine.  Moreover, the fact that routing some FDIC enforcement proceedings to jury trials might potentially pose disruption does not, without more, save an otherwise unconstitutional scheme from judicial scrutiny.  *See Granfinanciera*, 492

139.    Finally, the use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Burgess would not "impede swift resolution of the claims created by statute." *Jarkesy*, 34 F.4th at 453.  In *Jarkesy*, the Court found that there was "no evidence that jury trials would impede swift resolution" of SEC enforcement proceedings and noted that, in the particular case of Mr. Jarkesy, the "SEC took seven years to dispose of" the case.  *Id.* at 456.  Here, the situation is even worse than the seven-year slog at issue in *Jarkesy*.  The FDIC initiated its investigation against Burgess more than 12 years ago and has been pursuing a formal Enforcement Proceeding against him for more than 8 years.  And the Enforcement Proceeding still has not concluded.  Certainly a jury trial in this Court would have been much quicker than the Enforcement Proceeding.

140.    For the reasons explained above, Burgess was entitled to a jury trial.  The deprivation of a jury in cases where one is required by the Seventh Amendment is a fundamental structural error that requires vacatur of the entire proceeding.  *Jarkesy*, 34 F.4th at 459.

## JURY DEMAND

Burgess demands a trial by jury on all issues triable as such.

---

U.S. at 2802-03; *Bowsher*, 478 U.S. at 736 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.").

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Cornelius Campbell Burgess respectfully requests that the Court enter each of the following forms of relief:

      a.      Granting the forms of declaratory relief set forth above;

      b.      A stay or injunction barring continuation of the Enforcement Proceeding;

      c.      An award of the attorneys' fees, costs, and expenses that Burgess has incurred in connection with this action; and

      d.      Such other relief as is just and proper.

Dated:  October 6, 2022          Respectfully submitted,

                          */s/ Manuel G. Berrelez*

                          Manuel G. Berrelez (Texas Bar No. 24057760)
                                mberrelez@velaw.com
                          Thomas P. Mitsch (Texas Bar No. No. 24102218)
                                  tmitsch@velaw.com
                          James F. Hopper (Texas Bar No. 24116535)
                                  jhopper@velaw.com
                          Madelyn B. Carter (Texas Bar No. 24121529)
                                  mcarter@velaw.com
                          VINSON & ELKINS LLP
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3900
                          Dallas, Texas 75201
                          Telephone: (214) 220-7700
                          Facsimile: (214) 220-7716

                          *Counsel for Plaintiff Cornelius Campbell Burgess*