**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| **CORNELIUS CAMPBELL BURGESS**, <br><br> *Plaintiff,* <br><br>    *v.* <br><br> **FEDERAL DEPOSIT INSURANCE CORPORATION**; **MARTIN J. GRUENBERG**, in his official capacity as Acting Chairman of the FDIC; **MICHAEL J. HSU**, in his official capacity as a Director of the FDIC; **ROHIT CHOPRA**, in his official capacity as a Director of the FDIC; and **JENNIFER WHANG**; in her official capacity as an Administrative Law Judge, <br><br> *Defendants.* | Civil Action No. 7:22-cv-00100-O <br><br> The Honorable Reed O'Connor, United States District Judge, Presiding |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND A TEMPORARY ADMINISTRATIVE STAY**

Manuel G. Berrelez (Texas Bar No. 24057760)
  mberrelez@velaw.com
Thomas P. Mitsch (Texas Bar No. No. 24102218)
  tmitsch@velaw.com
James F. Hopper (Texas Bar No. 24116535)
  jhopper@velaw.com
Madelyn B. Carter (Texas Bar No. 24121529)
  mcarter@velaw.com
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716

*Counsel for Plaintiff Cornelius Campbell Burgess*

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION ..........................................................................................................1

FACTS ...........................................................................................................................3

    A.    The Structure of the FDIC and Its Administrative Adjudications. ................3

    B.    The FDIC's Enforcement Proceeding Against Burgess................................6

STANDARD OF REVIEW .............................................................................................7

ARGUMENT ..................................................................................................................8

    I.    Burgess Is Entitled to a Preliminary Injunction...........................................8

        A.    Burgess Is Likely to Succeed on the Merits of His Constitutional Claims...........8

            1.    Burgess Is Likely to Succeed on His Claim that the FDIC's Board Is Unconstitutionally Structured (Count 1)....................................8

            2.    Burgess Is Likely to Succeed on His Claim that the ALJs Used by the FDIC Enjoy Unconstitutional Protection from Removal (Count 2). ......11

            3.    Burgess Is Likely to Succeed on His Claim that the FDIC Violated the Seventh Amendment by Depriving Him of a Jury Trial (Count 3). ...........14

        B.    Absent an Injunction, Burgess Will Suffer Irreparable Harm............................18

        C.    The Equities Favor the Issuance of an Injunction, and an Injunction Would Not Disserve the Public Interest. ........................................21

    II.    This Court Has Competent Subject-Matter Jurisdiction. ...............................23

        A.    12 U.S.C. § 1818(h) Does Not Divest This Court of Jurisdiction. .....................23

        B.    12 U.S.C. § 1818(i)(1) Does Not Divest This Court of Jurisdiction...................24

            1.    Section 1818(i)(1) Does Not Explicitly Bar Jurisdiction Over Structural Constitutional Claims of the Type Presented in Burgess's Complaint........25

            2.    Section 1818(i)(1) Does Not Implicitly Bar This Court's Jurisdiction........29

    III.    This Court Should Enter a Temporary Administrative Stay Pending Disposition of this Motion. ........................................................32

CONCLUSION .............................................................................................................35

CERTIFICATE OF SERVICE ......................................................................................36

CERTIFICATE OF COMPLIANCE .............................................................................37

## TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Atl. Sounding Co. v. Townsend,*
   557 U.S. 404 (2009) ......................................................................................... 28

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,*
   430 U.S. 442 (1977) ......................................................................................... 14

*Bank of Louisiana v. FDIC,*
   No. No. 16-cv-13585, 2017 WL 3849340 (E.D. La. Jan. 13, 2017) ........................ 26

*Bank of Louisiana v. FDIC,*
   919 F.3d 916 (5th Cir. 2019) ...................................................................... 25, 26

*Bowen v. Mich. Acad. of Family Physicians,*
   476 U.S. 667 (1986) ......................................................................................... 28

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ......................................................................................... 19

*Burgess v. FDIC,*
   871 F.3d 297 (5th Cir. 2017) .................................................... 6, 12, 20, 22

*Carr v. Saul,*
   141 S. Ct. 1352 (2021) ...................................................................................... 31

*CBS Inc. v. PrimeTime 24 Joint Venture,*
   245 F.3d 1217 (11th Cir. 2001) ......................................................................... 27

*Clark v. Martinez,*
   543 U.S. 371 (2005) ......................................................................................... 29

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021) (en banc) ...................................................... *passim*

*Cochran v. SEC,*
   969 F.3d 507 (5th Cir. 2020) ............................................................................ 26

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021) ...................................................................................... 18

*Consumers' Res. v. Cons. Prod. Safety Comm'n,*
   No. 6:21-cv-256, 2022 WL 1577222 (E.D. Tex. Mar. 18, 2022) ..................... 11, 18

*Corrigan Dispatch Co. v. Casa Guzman,*
   569 F.2d 300 (5th Cir. 1978) ............................................................................ 23

*Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.,*
   710 F.3d 579 (5th Cir. 2013) .............................................................................. 7

*Dimick v. Schiedt,*
   293 U.S. 474 (1935) ......................................................................................... 14

**Cases—Continued:**                                                    **Page(s)**

*Doe #1 v. Trump*,
    944 F.3d 1222 (9th Cir. 2019) ................................................. 33

*Doe v. Texas Christian Univ.*,
    No. 4:22-cv-00297-O, 2022 WL 1573074 (N.D. Tex. Apr. 29, 2022)................................... 19

*Foley v. Biden*,
    No. 4:21-cv-01098-O, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ........................ 7

*Franciscan All., Inc. v. Burwell*,
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................... 23

*Free Enter. Fund v. Pub. Co. Account. Oversight Bd.*,
    561 U.S. 477 (2010)................................................ *passim*

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ...................................................... 14

*I.A.M. Nat'l Pension Fund Benefit Plan C. v. Stockton TRI Indus.*,
    727 F.2d 1204 (D.C. Cir. 1984) ........................................ 27

*In re Abbott*,
    800 F. App'x 296 (5th Cir. 2020) ................................... 33, 34

*In re Hooper*,
    112 B.R. 1009 (B.A.P. 9th Cir. 1990)................................... 16

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ......................................... 23

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ..................................... *passim*

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) .......................................... 23

*Kelley v. Azar*,
    No. 4:20-cv-00283-O, 2021 WL 4025804 (N.D. Tex. Feb. 25, 2021) .................................... 10

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)................................................... 33

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)............................................. 6, 12

*Mata v. Lynch*,
    576 U.S. 143 (2015)................................................... 31

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991)................................................... 27

*Miss. Power & Light Co. v. United Gas Pipe Line*,
    760 F.2d 618 (5th Cir. 1985) .......................................... 7

iii

**Cases—Continued:** **Page(s)**

*Myers v. United States*,
    272 U.S. 52 (1926) ......................................................................... 8

*Nat'l Urb. League v. Ross*,
    977 F.3d 698 (9th Cir. 2020) ................................................... 33, 34

*Rover Pipeline, LLC v. Fed. Energy Reg. Comm'n*,
    (N.D. Tex. No. 3:22-cv-00232), ECF 34 (May 24, 2022) ...................... 24

*Richardson v. Texas Sec'y of State*,
    978 F.3d 220 (5th Cir. 2020) ........................................................ 34

*Scott v. S. Elec. Supply Co.*,
    No. 12-cv-119, 2013 WL 3280276 (N.D. Miss. June 27, 2013) ............. 21

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ........................................................... *passim*

*Texas v. United States*,
    201 F. Supp. 3d 810, 818 (N.D. Tex. 2016) ................................... 23

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................... *passim*

*Trivedi v. Gen. Elec. Co.*,
    No. 19-11862-PBS, 2021 WL 2229088 (D. Mass. May 27, 2021) ......... 34

*Tull v. United States*,
    481 U.S. 412 (1987) ............................................................. 14, 15

*U.S. Navy SEALs 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ...................................... 7, 23

*Valley v. Rapides Par. Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ...................................................... 19

*Webster v. Doe*,
    486 U.S. 592 (1988) .................................................................. 27

*Wiener v. United States*,
    357 U.S. 349 (1958) ................................................................... 4


**Constitutional Provisions:**

U.S. Const. amend. VII ................................................................ 14

The Vesting Clause, U.S. Const. art. II, § 1, cl. 1 ............................ 8

The Take Care Clause, U.S. Const. art. II, § 3 ................................. 8


**Statutes:**

5 U.S.C. § 1202(d) ............................................................... 5, 12

**Statutes—Continued:**     **Page(s)**

5 U.S.C. § 7521(a) ....................................................................... 5, 12

12 U.S.C. § 2 ...................................................................................... 4

12 U.S.C. § 1812(a) ............................................................................ 3

12 U.S.C. § 1812(a)(1) ............................................................... 3, 4, 9

12 U.S.C. § 1812(c)(1) ............................................................... 3, 10

12 U.S.C. § 1818 ....................................................................... *passim*

12 U.S.C. § 1818(c) ......................................................................... 28

12 U.S.C. § 1818(e) ........................................................................... 4

12 U.S.C. § 1818(e)(1)(A) ............................................................... 16

12 U.S.C. § 1818(e)(4) ....................................................................... 4

12 U.S.C. § 1818(h) ................................................................... 23, 24

12 U.S.C. § 1818(i) ..................................................................... 4, 10

12 U.S.C. § 1818(i)(1) .............................................................. *passim*

12 U.S.C. § 1821(k) ......................................................................... 17

12 U.S.C. § 1828 ............................................................................. 10

15 U.S.C. § 78y ............................................................................... 23

18 U.S.C. § 1252(b)(9) .................................................................... 27

28 U.S.C. § 1331 ....................................................................... 23, 29

28 U.S.C. § 1651 ............................................................................. 33

**Regulations:**

12 C.F.R. § 308.3 ............................................................................... 5

12 C.F.R. § 308.5 ............................................................................... 4

12 C.F.R. § 308.5(b)(8) ..................................................................... 5

12 C.F.R. § 308.31(a) ......................................................................... 4

12 C.F.R. § 308.35 ............................................................................. 4

12 C.F.R. § 308.38 ............................................................................. 5

12 C.F.R. § 308.39 ............................................................................. 5

12 C.F.R. § 308.40(a) ......................................................................... 5

12 C.F.R. § 308.40(c)(2) ............................................................ 5, 7,11

**Rules:**

Federal Rule of Civil Procedure 65(c) ............................................. 23

**Statutory History:**

S. Rep. No. 1482 (1966) .................................................................. 28

**Other Authorities:**                                                                        **Page(s)**

Bayefsky, Rachel, *Administrative Stays: Power and Procedure,*
  97 Notre Dame L. Rev. 1941 (2022) .......................................................................... 33

Br. of Washington Legal Found. as *Amicus Curiae*, *Calcutt v. FDIC*,
  37 F.4th 293 (6th Cir. 2022), 2021 WL 1522018 (Apr. 9, 2021) ............................... 10

Calabresi, Steven G. & Saikrishna B. Prakash, *The President's Power to Execute the Laws*,
  104 Yale L.J. 541 (1994) ....................................................................................... 8, 9

Gillette, Adam C., *Form Over Function: How* Collins v. Yellen *Signals a*
  *Threat to the Independence of Multimember Financial Regulatory Agencies*,
  26 N.C. Banking Inst. 109 (2022).............................................................................. 10

Grove, Tara Leigh, *A (Modest) Separation of Powers Success Story*,
  87 Notre Dame L. Rev. 1647 (2012) .......................................................................... 28

Katz, Martin J., *Guantanamo,* Boumediene*, and Jurisdiction-Stripping:*
  *The Imperial President Meets the Imperial Court*, 25 Const. Comment. 377 (2009) ............. 28

Nielson, Aaron L., *Is the FTC on a Collision Course with the Unitary Executive?*,
  Yale J. on Reg. Notice & Comment (July 21, 2021) ................................................... 10

Prakash, Saikrishna, *New Light on the Decision of 1789*,
  91 Cornell L. Rev. 1021 (2006) ................................................................................... 8

Redmond, Roland L., *The Securities Exchange Act of 1934: An Experiment in*
  *Administrative Law*, 47 Yale L.J. 622 (1938).......................................................... 29

Rubinstein, Samuel, *Chairpointment: Rethinking the Appointment of Independent*
  *Agency Chairpersons*, Harv. J. on Leg. Online (2020)............................................ 10

Seipp, David J., *Trust and Fiduciary Duty in the Early Common Law*,
  91 B.U. L. Rev. 1011 (2011) ....................................................................................... 16

Sunstein, Cass R. & Adrian Vermeule, *The Unitary Executive: Past, Present, Future*,
  2020 Sup. Ct. Rev. 83 (2020) ..................................................................................... 10

## <u>INTRODUCTION</u>

For more than twelve years, unelected bureaucrats at the Federal Deposit Insurance Corporation ("FDIC") have been pursuing a politically-motivated administrative enforcement proceeding against Plaintiff Cornelius Campbell Burgess ("Burgess"). The purported justification for the FDIC's investigation is that Burgess engaged in self-dealing while serving as the President and CEO of Herring Bank, which is a community bank that Burgess's great-grandfather founded in Vernon more than a century ago. But in truth the investigation is a stalking horse through which unaccountable civil servants seek to punish Burgess because they harbor political disagreements with him and dislike his management style. *See* Complaint (ECF No. 1) ("Compl.") ¶¶ 4, 58.

Although Burgess strongly disagrees with the allegations that the FDIC has levied against him, this case has nothing to with the merits of the FDIC's claims. Instead, this case is entirely about **<u>how</u>** the FDIC is adjudicating the charges against Burgess. As explained in detail below, the FDIC's proceeding (the "Enforcement Proceeding") is unconstitutional in its entirety. Burgess therefore requests that this Court enter a preliminary injunction barring the FDIC from continuing the Enforcement Proceeding. That relief is necessary to ensure that this Court has an opportunity to evaluate the merits of Burgess's claims (and, if appropriate, to craft a meaningful remedy) before the FDIC inflicts yet more harm on Burgess by issuing its imminent Final Decision.

Burgess easily satisfies the familiar multi-part test for issuing a preliminary injunction.

<u>First</u>, Burgess has a substantial likelihood of success on the merits. In Count 1, Burgess alleges that the structure of the FDIC's Board of Directors is unconstitutional. In *Seila Law LLC v. CFPB*, the Supreme Court held that the President must be able to remove, at will, the heads of agencies that are "vested with significant executive power." 140 S. Ct. 2183, 2201 (2020). Burgess is likely to succeed on his challenge to the FDIC's structure because that agency wields significant executive power, but yet a majority of its Board enjoys for-cause protection from

1

removal. *See infra* Section I.A.1. In Count 2, Burgess alleges that the tenure protections afforded to the administrative law judges ("ALJs") used by the FDIC are unconstitutional. Burgess is likely to succeed on this claim because recent Supreme Court precedent has confirmed that (1) inferior officers cannot have "double for-cause" removal protection and (2) ALJs are inferior officers. Thus, the ALJs used by the FDIC—who enjoy double for-cause protections against removal—are unconstitutional. *See infra* Section I.A.2. In Count 3, Burgess alleges that the FDIC unlawfully deprived Burgess of his right to a jury trial. In *Jarkesy v. SEC*, the Fifth Circuit recently explained that the Seventh Amendment guarantees a jury in any administrative enforcement action "akin to traditional actions at law," specifically including "actions seeking civil penalties." 34 F.4th 446, 451-52, 454 (5th Cir. 2022). Burgess is likely to succeed on his Seventh Amendment claim because the Enforcement Proceeding is exactly such an action. *See infra* Section I.A.3.

Second, Burgess faces a substantial threat of irreparable harm. Absent this Court's swift intervention, the FDIC may issue a Final Decision ruling against Burgess at any time after October 17. The very issuance of a Final Decision—regardless of what it says—will cause an irreparable injury to Burgess by mooting the possibility of any prospective remedy, which in turn will unfairly complicate his ability to secure meaningful judicial review. Moreover, an injunction is also necessary to prevent other impending and irreparable harms, including reputational and economic damages. And an injunction is necessary to block the FDIC from imposing serious sanctions in its impending Final Decision. One of those sanctions is likely to be a "prohibition order," which is colloquially known as the "death penalty" in the banking industry because it will operate to forever bar Burgess, who has been a respected banker in Amarillo for some thirty years, from ever working anywhere in the banking industry again for the rest of his life. *See infra* Section I.B.

Third, the weight of the equities and the public interest favor the issuance of an injunction. Allowing the FDIC to issue a Final Decision would not just injure Burgess, but would also have significant externalities; for example, the Final Decision will likely order Burgess removed from his position as a director of Herring Bank (the "Bank"), which in turn will harm the Bank and its depositors, who rely on Burgess for his practical know-how and vision. Conversely, the Bank will suffer no harm from an injunction. And an injunction is always in the public interest when it operates to halt ongoing or impending violations of the Constitution. *See infra* Section I.C.

Because it is so clear that the four-part test for a preliminary injunction can be satisfied on this record, Burgess anticipates that the FDIC will, in an effort at self-help, attempt to avoid a ruling on the merits by suggesting that this Court lacks subject-matter jurisdiction. Any such argument would be meritless. Article III courts have expansive federal-question jurisdiction under 28 U.S.C. § 1331, and nothing in the FDIC's enabling statutes prevent the issuance of an injunction when, as here, the plaintiff is pressing **structural** constitutional claims. *See infra* Section II.

Finally, Burgess respectfully requests that this Court enter a temporary administrative stay while his preliminary-injunction motion remains pending. Absent that relief, the FDIC could enter a Final Decision before this Motion is even fully briefed. *See infra* Section III.

## FACTS

### A.    The Structure of the FDIC and Its Administrative Adjudications.

The FDIC is an "independent agency" that has expansive power to enforce a variety of banking laws against regulated parties. 12 U.S.C. §§ 1812(a), 1818; Compl. ¶¶ 18, 23-26, 31.

The FDIC is headed by a five-member Board of Directors. 12 U.S.C. § 1812(a)(1). Three of those members are appointed by the President to fixed, six-year terms. *Id.* § 1812(c)(1). The three appointed members of the FDIC may only be removed by the President for cause. *See Wiener v. United States*, 357 U.S. 349, 352, 356 (1958) (equating fixed-length terms with for-cause

removal protection); *Free Enter. Fund v. Pub. Co. Account. Oversight Bd.*, 561 U.S. 477, 487 (2010) (*"PCAOB"*) (same).  The remaining two directors are "dual hat" and *ex officio* members of the Board.  They are the Comptroller of the Currency (the "Comptroller") and the Director of the Consumer Financial Protection Bureau ("CFPB").  *See* 12 U.S.C. § 1812(a)(1)(A)-(B).  Both the Comptroller and the CFPB Director may be fired at will by the President.  *See id.* § 2; *Seila Law*, 140 S. Ct. at 2209; Compl. ¶¶ 35-36.  The current members of the Board (all of whom are Defendants here) are Martin J. Gruenberg, its Acting Chairman; Michael J. Hsu, who also serves as Comptroller; and Rohit Chopra, who also serves as the CFPB Director.  *Id.* ¶¶ 19-21.

The FDIC is empowered by statute to issue a "notice of charges" against an enforcement target who is alleged to have violated banking laws, to conduct administrative adjudications of those charges, and, if those charges are sustained, to order a wide variety of sanctions.  *See* 12 U.S.C. § 1818; Compl. ¶ 23.  The most severe sanctions that the FDIC can impose are a "removal" order (which will operate to remove its subject from the bank-related offices that he or she holds) and a "prohibition order" (which will operating to forever bar its subject from working anywhere in the American banking industry for the rest of their life).  *See* 12 U.S.C. § 1818(e); Compl. ¶ 24.  The FDIC can also impose significant civil monetary penalties.  12 U.S.C. § 1818(i).

When the FDIC issues a notice of charges, it must also fix a time and place for an administrative hearing on those charges.  *See* 12 U.S.C. § 1818(e)(4).  Those hearings are in turn conducted by an ALJ.  *See* 12 C.F.R. §§ 308.5, 308.35, 308.31(a).  The ALJs used by the FDIC have a broad range of powers, including the abilities to issue subpoenas, rule on the admissibility of evidence, and decide critical substantive motions.  *See  id.* § 308.5; Compl. ¶ 48.  After the hearing has concluded, the ALJ prepares a "recommended decision" for presentation to the FDIC's Board.  *See* 12 C.F.R. §§ 308.5(b)(8), 308.38.  Parties may then file "exceptions" to the ALJ's

recommended decision. *See id.* § 308.39. As soon as the exceptions are on file, the FDIC's "Administrative Officer"[1] may determine that the record is complete and notify the parties that the proceeding has been submitted to the FDIC's Board for Final Decision. *See id.* § 308.40(a). At that point, the FDIC's Board may render a Final Decision that imposes immediately-effective sanctions on the enforcement target. The FDIC's Board must issue a Final Decision within 90 days of the date on which the matter is submitted for its review. *See id.* § 308.40(c)(2).

Despite the significant executive authority wielded by the ALJs used by the FDIC, those ALJs enjoy an extraordinary level of protection from removal. The ALJs used by the FDIC can only be fired if a majority of the Merit Systems Protection Bureau ("MSPB") determines that there is "good cause" for their termination. *See* 5 U.S.C. § 7521(a); Compl. ¶ 50. The five members of the MSPB in turn enjoy for-cause protection of their own. *See* 5 U.S.C. § 1202(d); Compl. ¶ 54.

To make matters worse, the FDIC cannot even unilaterally initiate a proceeding to remove the ALJs that it uses. That is so because the ALJs who work for the FDIC are part of an obscure entity called the Office of Financial Institution Adjudication ("OFIA"), which maintains a "pool" of ALJs who conduct adjudications on behalf of the FDIC and three other federal agencies with related jurisdiction (together, the "Banking Agencies"). *See* Compl. ¶¶ 39-45 (discussing OFIA). By leveraging document requests pursuant to the Freedom of Information Act, regulated parties have recently been able to extract the Banking Agencies' non-public internal memoranda of understanding concerning OFIA. Remarkably, those memoranda establish that OFIA's ALJs— including Defendant ALJ Whang, who is presiding over the Enforcement Proceeding against Burgess—cannot even be referred to the MSPB for removal proceedings unless all four Banking

---

[1] The FDIC's Administrative Officer is an "inferior officer" appointed by the FDIC Board "to serve as the Board's designee to hear certain motions or requests in an adjudicatory proceeding and to be the official custodian of the record" for the FDIC. *See* 12 C.F.R. § 308.3.

Agencies unanimously agree, in writing, on that course of action.  *See id.* ¶¶ 11, 42-43, 49.  The ultimate result of this arrangement is that at least 11 different unelected bureaucrats would need to agree that it is appropriate to terminate an ALJ before that ALJ could be removed from office; of those 11 people, at least 9 enjoy for-cause protection from removal.  *See id.* ¶¶ 11, 49-56.

      **B.**      **The FDIC's Enforcement Proceeding Against Burgess.**

      In November 2014, the FDIC formally opened an Enforcement Proceeding against Burgess and referred the matter for a hearing before one of OFIA's ALJs.  Compl. ¶¶ 60, 62.  In September 2016, a seven-day hearing was held before ALJ Christopher McNeil.  *Id.* ¶ 65.  In January 2017, ALJ McNeil issued a Recommended Decision in favor of the FDIC.  *Id.* ¶ 66.  And in August 2017, the FDIC Board accepted that Recommended Decision and levied significant sanctions against Burgess.  *Id.* ¶ 67.  Burgess then filed a petition for review with the Fifth Circuit.  The Fifth Circuit entered a published Order that stayed the Board's Final Decision because it found that Burgess was likely to succeed on the merits of his argument that the ALJs used by the FDIC were unconstitutional under the Appointments Clause.  *See Burgess v. FDIC*, 871 F.3d 297, 302-04 (5th Cir. 2017).  Not long after, the Supreme Court decided in *Lucia v. SEC* that ALJs are inferior officers of the United States.  138 S. Ct. 2044, 2055 (2018).  The Fifth Circuit then remanded the matter to the FDIC, at which point the agency reassigned the case to ALJ C. Richard Miserendino, and then ping-ponged the case yet again to a third ALJ (Defendant Whang).  Compl. ¶¶ 72-75.

      In January 2022, ALJ Whang held a three-day supplemental hearing.  Compl. ¶ 76.  And on September 16, 2022, ALJ Whang issued a Recommended Decision.  ALJ Whang recommended that Burgess be removed from his bank-related offices, be prohibited from further participation in the banking industry, and be assessed a civil monetary penalty of $200,000.  *Id.* ¶ 77.

Burgess intends to file timely exceptions to ALJ Whang's Recommended Decision, which are due on or before October 17, 2022. Compl. ¶ 78. At any time after the exceptions are filed, the parties could receive notice that the proceeding has been submitted to the FDIC Board, which could then render a "Final Decision" and impose sanctions on Burgess (e.g., removal, prohibition, monetary penalties) that would be immediately effective. *Id.* Although the Board can take as long as 90 days after the case is submitted for its review to issue a Final Decision, 12 C.F.R § 308.40(c)(2), the Board can—and often does—render Final Decisions in fewer than 90 days. For example, the Board issued its 2017 Final Decision in Burgess's case only 74 days after the FDIC's Administrative Officer submitted that case for the Board's review. *See* Compl. ¶¶ 78-79.

## **STANDARD OF REVIEW**

"The decision to grant or deny a preliminary injunction is discretionary with the district court." *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 828 (N.D. Tex. 2022) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985)). To receive a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest." *Foley v. Biden*, No. 4:21-cv-01098-O, 2021 WL 7708477, at *1 (N.D. Tex. Oct. 6, 2021) (citing *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two elements of this four-part test are merged and considered together when the government is the party opposing the injunction. *See SEALs 1-26*, 578 F. Supp. 3d at 840.

## ARGUMENT

I.     **Burgess Is Entitled to a Preliminary Injunction.**

    A.     **Burgess Is Likely to Succeed on the Merits of His Constitutional Claims.**

        1.     **Burgess Is Likely to Succeed on His Claim that the FDIC's Board Is Unconstitutionally Structured (Count 1).**

The Vesting Clause provides that "[t]he executive power"—all of it—"shall be vested in a President of the United States."  U.S. Const. art. II, § 1, cl. 1.  The Framers placed the entirety of the executive power in the President because they felt that a Unitary Executive would be "conducive to energy, dispatch, and responsibility" and would ensure that America's leaders— unlike King George III—would remain accountable to the people.  Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 639 (1994).

Since the Founding, it has been understood that the executive power granted to the President in Article II "include[s] a power to oversee executive officers through removal." *PCAOB*, 561 U.S. at 492; *see* Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1023 (2006) (discussing the "Decision of 1789," in which "the first Congress concluded that the Constitution's grant of executive power authorized the President to remove executive officers"); Compl. ¶ 91.  The President's removal power is derived not just from Article II's Vesting Clause, but also from its Take Care Clause, which provides that the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  Like the Vesting Clause, the Take Care Clause "guarantees the President a certain degree of control over executive officers," and reflects the Founders' belief that the **"**President must have adequate power over officers' . . . removal" because "[o]nly then can the People, to whom the President is directly accountable, vicariously exercise authority over high-ranking executive officials."  *Jarkesy*, 34 F.4th at 463.

The Supreme Court first recognized the President's removal power in *Myers v. United States*, 272 U.S. 52 (1926). In the intervening century, the Supreme Court has decided a variety of cases that together delineate the outer limits on Congress's ability to restrict the President's removal power. The Supreme Court's recent decision in *Seila Law* synthesized those prior cases into an easy-to-administer rule: Congress may not interfere with the President's "unrestricted removal power," subject only to "two exceptions." 140 S. Ct. at 2198. The first exception is that Congress may constrain the President's ability to remove "**inferior** officers with limited duties and no policymaking or administrative authority." *Id.* at 2200 (emphasis added). The second exception applies to **principal** officers, who, by virtue of their significant ability to influence agency policy, must be more accountable to the President than inferior officers. Congress may constrain the President's ability to remove principal officers only when they serve as the heads of "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199-2200.

The FDIC's Board is unconstitutional under *Seila Law*. *See* Compl. ¶¶ 90-105.

At the outset, there can be no debate that the members of the FDIC's Board are "principal" officers who are the heads of a multimember expert agency. *See* 12 U.S.C. § 1812(a)(1) ("The management of the [FDIC] shall be vested in a Board of Directors consisting of 5 members.").

Moreover, the FDIC plainly "wields substantial executive power." Executive power, as distinct from legislative power or judicial power, refers to the ability to execute and enforce the law. *See Seila Law*, 140 S. Ct. at 2194, 2198; *see also* Calabresi & Prakash, *supra*, at 579-80. The FDIC wields exactly this type of "executive" authority; indeed, the FDIC's frightening arsenal of executive powers closely resembles the list of "quintessentially executive powers" that the Supreme Court provided in *Seila Law*. 140 S. Ct. at 2200. For example, *Seila Law* found that the CFPB Director wielded executive power because he could, "though administrative adjudications,"

bring "the coercive power of the state to bear on millions of private citizens." *Id.* at 2200-01. The same is true of the FDIC Board, which has authority to conduct administrative adjudications that have a profound effect on regulated parties and the nation at large. *See* 12 U.S.C. § 1818. *Seila Law* also found it probative that the CFPB Director "possesses the authority to promulgate binding rules" implementing a wide variety of statutes. *Seila Law*, 140 S. Ct. at 2200. Again, the same is true of the FDIC Board, which has authority to issue binding rules (and which in fact administers many more statutes than does the CFPB, an agency of more recent vintage). *See* 12 U.S.C. § 1828. And *Seila Law* concluded that the CFPB Director wielded executive power because he was empowered "to seek daunting monetary penalties against private parties." *Seila Law*, 140 S. Ct. at 2200. Yet again, the FDIC Board has exactly the same authority. *See* 12 U.S.C. § 1818(i).

Because the members of the FDIC's Board are (1) principal officers who (2) serve as the head of an agency that "wield[s] substantial executive power," the President must be able to fire those officers at will. Congress has nonetheless insulated a majority of the FDIC's Board from removal. *See* 12 U.S.C. § 1812(c)(1). Burgess is likely to succeed on the merits of his claim that this arrangement is unconstitutional. Indeed, a litany of legal academics[2] and public-interest groups[3] have already ably explained the constitutional infirmities with the FDIC's structure. And

---

[2] *See* Cass R. Sunstein & Adrian Vermeule, *The Unitary Executive: Past, Present, Future*, 2020 Sup. Ct. Rev. 83, 85 (2020) (noting that *Seila Law* casts "grave doubt" over the legality of removal protections applicable to "independent agencies with multiple heads" such as the FDIC); Adam C. Gillette, *Form Over Function: How* Collins v. Yellen *Signals a Threat to the Independence of Multimember Financial Regulatory Agencies*, 26 N.C. Banking Inst. 109, 115, 132 (2022) (suggesting that removal protections for the FDIC's appointed directors are unconstitutional under *Seila Law*); Samuel Rubinstein, *Chairpointment: Rethinking the Appointment of Independent Agency Chairpersons*, Harv. J. on Leg. Online (2020) (same); *see also* Aaron L. Nielson, *Is the FTC on a Collision Course with the Unitary Executive?*, Yale J. on Reg. Notice & Comment (July 21, 2021), https://bit.ly/3EGdjAI (noting that, under "*Collins* and *Seila Law*," the directors of "[m]ulti-headed independent agencies" such as the FDIC are on notice that "their removal protections . . . conflict[] with the Supreme Court's current understanding of the separation of powers").

[3] *See* Br. of Washington Legal Found. as *Amicus Curiae* at 28, *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022), 2021 WL 1522018, at *28 (Apr. 9, 2021) (under *Seila Law*, the "President must be able to remove FDIC directors at-will").

multiple cases—from both this District[4] and others in Texas[5]—have confirmed that agencies with structures closely akin to that of the FDIC are unconstitutional under *Seila Law*.

Because Burgess is likely to succeed on his claim that the FDIC is an unconstitutionally structured agency, he is entitled to a preliminary injunction barring the FDIC and its Directors from proceeding in any way with the Enforcement Proceeding, including by issuing a Final Decision or taking any other action contemplated by 12 C.F.R. § 308.40(c)(2).  A preliminary injunction is necessary to preserve the status quo pending further proceedings through which this court can issue a final judgment and order a remedy that it determines to be appropriate.

### 2. Burgess Is Likely to Succeed on His Claim that the ALJs Used by the FDIC Enjoy Unconstitutional Protection from Removal (Count 2).

Burgess is also likely to succeed on the merits of his claim that the entire Enforcement Proceeding is unconstitutional because ALJ Whang enjoys double for-cause removal protection.

In *PCAOB*, the Supreme Court considered the constitutionality of the removal protections afforded to members of the Public Company Accounting Oversight Board ("Accounting Board"). The Accounting Board was composed of five members who were officers of the United States. 561 U.S. at 485-86.  The members of the Accounting Board could only be removed for cause by the Securities and Exchange Commission ("SEC"), and the SEC's Commissioners in turn could only by removed for cause by the President.  *Id.* at 486-87.  The Supreme Court held that "the dual for-cause limitations on the removal of [Accounting] Board members contravene the

---

[4] *Kelley v. Azar*, No. 4:20-cv-00283-O, 2021 WL 4025804, at *14 (N.D. Tex. Feb. 25, 2021) (O'Connor, J.) ("Pursuant to [the] fundamental principle of the separation of powers, Congress may not create independent agencies wielding substantial executive power that are insulated from all Presidential control." (citing *Seila Law*, 140 S. Ct. at 2199)).

[5] In *Consumers' Research v. Consumer Product Safety Commission*, the plaintiffs raised removability concerns about the members of the Consumer Product Safety Commission ("CPSC").  That agency, like the FDIC, is headed by five directors who wield substantial executive power but cannot be removed by the President except for good cause shown. Judge Kernodle held that the structure of the CPSC was unconstitutional, issued a declaratory judgment to that effect, and granted partial summary judgment pursuant to Federal Rule of Civil Procedure 54(b).  No. 6:21-cv-256, 2022 WL 1577222, at *12-16 (E.D. Tex. Mar. 18, 2022), *appeal docketed*, No. 22-40328 (5th Cir. June 15, 2022).

Constitution's separation of powers" and the Take Care Clause.  *Id.* at 493, 502-03.  The Court explained that the "second level of tenure protection" was unlawful because it meant that "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the [Accounting] Board."  *Id.* at 496.

Footnote 10 of the *PCAOB* Opinion indicated that the Supreme Court was <u>not</u> "address[ing] that subset of independent agency employees who serve as administrative law judges," for the stated reason that "[w]hether administrative law judges are necessarily 'Officers of the United States'" was at that time "disputed."  561 U.S. at 507 n.10.  In 2018, the Supreme Court decided *Lucia*, which squarely addressed the question the Court had left unanswered in footnote 10 of *PCAOB*.  *Lucia* held that SEC ALJs **<u>are</u>** inferior officers of the United States.  138 S. Ct. at 2055.

Under *Lucia*, the ALJs used by the FDIC, including ALJ Whang, are clearly "inferior officers of the United States."  If further confirmation were needed, the Fifth Circuit indicated in a published Order at a prior stage of this very case that the duties of the ALJs used by the FDIC are "sufficiently important, and their discretion sufficiently significant, **to render them Officers**" of the United States.  *Burgess*, 871 F.3d at 303 (emphasis added; internal quotation marks omitted).

Moreover, the ALJs used by the FDIC—like the members of the Accounting Board at issue in *PCAOB*—enjoy **at least** two layers of protection from removal.  The first layer of protection is that the ALJs used by the FDIC cannot be removed unless the MSPB finds that there is good cause for their termination.  *See* 5 U.S.C. § 7521(a).  And the second layer of protection is that the members of the MSPB themselves enjoy for-cause protection from removal.  *See id.* § 1202(d).

In its recent published decision in *Jarkesy*, the Fifth Circuit explained that the removal restrictions for the ALJs used by the SEC—which are identical in every respect to the removal protections for the ALJs used by the FDIC—were unconstitutional.  34 F.4th at 465.  In so holding,

the panel accepted the Petitioner's "straightforward" three-part argument:  (1) the "SEC ALJs are 'inferior officers'" under *Lucia*; (2) the "SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal" in violation of *PCAOB*; and ergo (3) the "statutory removal restrictions" for SEC ALJs "are unconstitutional."  *Id.* at 464-65.  *Jarkesy* is on-point authority that controls this case.[6]  There is no material difference between an ALJ used by the SEC and an ALJ used by the FDIC, both of whom can only be removed for cause by the MSPB.

In fact, the constitutional defect tainting the ALJs used by the FDIC is vastly <u>more</u> problematic than the defects at issue in *Jarkesy* and *PCAOB*.  That is so because the FDIC's Board—unlike the SEC—cannot even initiate a proceeding to remove an ALJ unilaterally; instead, all four of the so-called Banking Agencies must unanimously agree, in writing, to begin that process.  *See* Compl. ¶¶ 11, 49-56.  The Banking Agencies' vetogates amount to what is essentially a third level of removal protection for the ALJs used by the FDIC.  This arrangement—through which executive power is wielded not by the President as required by the Constitution but rather via a roll-call vote of a dozen unelected bureaucrats staffing five corners of the administrative state—is a far cry from the <u>Unitary</u> Executive envisioned by the Founders.  *Cf. PCAOB*, 561 U.S. at 497 (bemoaning the "Matryoshka doll of tenure protections" for inferior officers).

Because the ALJs used by the FDIC are inferior officers who enjoy double for-cause removal protection, Burgess is likely to succeed on the merits of his claim that it is unconstitutional for them to act as adjudicators in administrative enforcement proceedings.  *See* Compl. ¶¶ 106-118 (Count 2).  Burgess is therefore entitled to a preliminary injunction that (1) prevents any further exercise of executive authority by ALJ Whang and (2) prevents the FDIC from accepting

---

[6] ALJ Whang's Recommended Decision acknowledged *Jarkesy*, but did not even attempt to distinguish that case; instead, she noted that the Fifth Circuit's published decision in *Jarkesy* was, in her opinion, "in tension" with a separate Ninth Circuit precedent that she apparently viewed as being more persuasive.  Compl. ¶ 113 n.9.

or otherwise relying on ALJ Whang's Recommended Decision in whole or in part, given that the Recommended Decision was the product of an inferior officer whose service was unconstitutional.

### 3. Burgess Is Likely to Succeed on His Claim that the FDIC Violated the Seventh Amendment by Depriving Him of a Jury Trial (Count 3).

Finally, Burgess is likely to succeed in showing that the Enforcement Proceeding is unconstitutional because the FDIC has deprived him of his Seventh Amendment right to a jury.

The Seventh Amendment provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Because civil juries "have long served as a critical check on government power," *Jarkesy*, 34 F.4th at 451-52, the Supreme Court has insisted that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care," *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). *See* Compl. ¶¶ 120-21.

In *Tull v. United States*, the Supreme Court construed the Seventh Amendment "to require a jury trial in those actions that are analogous to 'Suits at common law'" because, "[p]rior to the Amendment's adoption, a jury trial was customary in suits brought in the English **law** courts." 481 U.S. 412, 417-18 (1987) (emphasis altered). *Tull* confirmed that the fact that the cause of action giving rise to the dispute was "created by congressional enactment" does not mean that no jury trial is required; instead, the operative question is whether the "statutory action is . . . **similar to** cases that were tried in courts of law." *Id.* (emphasis added); *see Jarkesy*, 34 F.4th at 452.

All of that said, the Supreme Court held in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission* that Congress may assign the adjudication of certain disputes to agencies instead of juries in a limited set of cases that implicate "public rights." 430 U.S. 442, 450 (1977). The Supreme Court later "refined" the concept of public rights in *Granfinanciera, S.A. v.*

14

*Nordberg*, 492 U.S. 33 (1989), where it clarified that "Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns 'traditional legal claims' to an administrative tribunal." *Jarkesy*, 34 F. 4th at 452 (quoting *Granfinanciera*, 492 U.S. at 52).

The Fifth Circuit's recent decision in *Jarkesy* is again instructive. That opinion clarified that, in this Circuit, the inquiry to determine whether an adjudication must be handled by a jury moves in two stages. "First, a court must determine whether an action's claims arise 'at common law' under the Seventh Amendment." *Jarkesy*, 34 F.4th at 453. And second, "if the action involves common-law claims, a court must determine whether the Supreme Court's public-rights cases nonetheless permit Congress to assign it to agency adjudication without a jury trial. *Id.*

The *Jarkesy* Court then went on to apply that test to the facts of the case at bar. The Petitioner in *Jarkesy* had been the target of an SEC enforcement proceeding in which the agency alleged that the Petitioner had committed securities fraud and sought various remedies against him, including substantial civil penalties. *Jarkesy*, 34 F.4th at 449-50. On appeal, Mr. Jarkesy argued that the SEC enforcement proceeding deprived him of his constitutional right to a trial by jury.

The *Jarkesy* panel began its analysis of that claim with the first question outlined above—i.e., whether the cause of action arose at common law. The *Jarkesy* court held that the cause of action against Mr. Jarkesy **did** arise at common law because a "civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 453-54 (quoting *Tull*, 481 U.S. at 422). As to the second question—i.e., whether the Supreme Court's "public rights" cases permitted the SEC to proceed with an adjudication that did not include a jury—the *Jarkesy* panel held that they did not. The panel concluded that (1) "[s]ecurities fraud actions are not new actions unknown to the common law" and that (2) "[j]ury trial in securities fraud suits would not dismantle the statutory scheme" or "impede swift resolution of the SEC's fraud prosecutions." *Id.* at 455

(internal quotation marks omitted).  And because Mr. Jarkesy was entitled to a trial by jury, the Fifth Circuit ordered the entirety of the SEC's proceeding against him to be "vacated."  *Id.* at 459.

This case is on all fours with *Jarkesy*.  Just as in *Jarkesy*, the FDIC's claims against Burgess—while nominally statutory—do arise at common law.  That is so because the FDIC is seeking a civil monetary penalty against Burgess.  *Jarkesy* held that the "Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties."  34 F.4th at 452; *accord In re Hooper*, 112 B.R. 1009, 1012 (B.A.P. 9th Cir. 1990) ("[A]n action to recover money damages for . . .  breach of fiduciary duty . . . was the type of action that would have been brought in a court of law in the courts of England prior to the merger of law and equity.").

The second question under *Jarkesy* is whether the public-rights doctrine permits Congress to route the proceeding to agency adjudication without a jury.  *See Jarkesy*, 34 F.4th at 453.  The relevant subsidiary "considerations include: (1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law;" and "(2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute."  *Id.* (internal quotation marks omitted).

One of the FDIC's chief allegations in the Enforcement Proceeding is that Burgess breached his fiduciary duties to Herring Bank as a result of his purportedly improper expense practices.  *See* 12 U.S.C. § 1818(e)(1)(A); Compl. ¶ 25.  Actions seeking remedies for breaches of fiduciary duties have been known at common law for centuries.  *See* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1013-16 (2011).  Indeed, ALJ Whang noted in her Recommended Decision that Burgess's alleged "self-dealing" was "a serious breach of [a] **common law** fiduciary duty."  Compl. ¶ 135 (emphasis added).

Moreover, the use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Burgess would not "dismantle the statutory scheme." *Jarkesy*, 34 F.4th at 453. When applying this factor, one critical consideration for the court's attention is whether the claims at issue are of "the sort . . . uniquely suited for agency adjudication." *Id.* at 456. Claims alleging entitlement to money damages for breaches of common-law duties do not fit that bill because, just as with the securities-law claims at issue in *Jarkesy*, "federal courts have dealt with actions" of this type "for many decades." *Id.* And the FDIC is certainly no stranger to jury-eligible proceedings, given that several of its enabling statutes allow it to bring cases in federal court against bank officials accused of various forms of misconduct—an authority it has often recently invoked. *See, e.g.*, 12 U.S.C. § 1821(k). The FDIC can also pursue offensive claims against regulated parties under state common law. Indeed, outside the context of removal and prohibition proceedings, the FDIC has often brought claims in federal court that seek money damages based on alleged breaches of common law fiduciary duties by bank officers—i.e., exactly the sorts of claims at issue in Burgess's Enforcement Proceeding. *See* Compl. ¶ 137 (collecting cases).

Finally, the use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Burgess would not "impede swift resolution of the claims created by statute." *Jarkesy*, 34 F.4th at 453 (internal quotation marks omitted). In *Jarkesy*, the Court found that there was "no evidence that jury trials would impede swift resolution" of SEC enforcement proceedings and noted that, in the particular case of Mr. Jarkesy, the "SEC took seven years to dispose of" the case. *Id.* at 456. Here, the situation is even worse than the seven-year slog at issue in *Jarkesy*. The FDIC initiated its investigation against Burgess more than 12 years ago and has been pursuing a formal Enforcement Proceeding against him for more than 8 years. And the Enforcement Proceeding still has not concluded.

Burgess is likely to succeed on the merits of his claim that the FDIC deprived him of his right to a jury trial.  *See* Compl. ¶¶ 119-140.  Burgess is therefore entitled to a preliminary injunction that prevents the FDIC from continuing the Enforcement Proceeding.

**B.    Absent an Injunction, Burgess Will Suffer Irreparable Harm.**

Unless this Court enters an injunction, the FDIC could soon issue its Final Decision in the Enforcement Action.  And that decision will in turn cause Burgess several irreparable harms.

First, the very issuance of the Final Decision—regardless of what it says—will injure Burgess by depriving him of an opportunity for meaningful judicial review.  Counts 1 and 2 of the Complaint currently request **prospective** rather than **retrospective** relief—i.e., they seek to block the Defendants from continuing the Enforcement Proceeding, rather than seeking to nullify anything that the Defendants have already done.  *See* Compl. ¶¶ 102-104, 117.  But as soon as the FDIC issues a Final Decision, the agency's process will be at an end, and ergo any claim for prospective relief will become moot; the only remedy at that point would be to retrospectively unwind what the agency has done.  And that presents a significant problem for Burgess.

In *Collins v. Yellen*, the Supreme Court held that, in order to establish an entitlement to retrospective relief for a constitutional problem relating to removability, the plaintiff must show a "compensable harm."  141 S. Ct. 1761, 1789 (2021).  For example, if the President had "attempted to remove [an agency] Director but was prevented from doing so," that would be a "compensable harm."  *Id.*  But when a plaintiff seeks prospective relief, he or she is **not** required to demonstrate this type of "compensable harm," and instead can secure an injunction merely by showing that the agency's structure is unconstitutional and that he or she has suffered an injury-in-fact for purposes of Article III standing.  *See Seila Law*, 140 S. Ct. at 2196; *Consumers' Research*, 2022 WL 1577222, at *5-13.  Burgess can plainly satisfy the lesser harm requirement attending a request for prospective relief (*see* Compl. ¶¶ 83-89), but he may experience more difficulty in attempting to

18

satisfy the greater harm requirement attending a request for retrospective relief.  **The FDIC should not be permitted to stack the decks in its favor by issuing a Final Decision before this Court has a chance to issue its judgment**.  The entire purpose of this lawsuit is to avoid the harm that would accrue if the FDIC did so.  Indeed, Judge Oldham recently noted that, "[a]fter *Collins*," a declaratory-judgment lawsuit of the type Burgess has filed today "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an agency's "unimpeded control over the way it investigates and proceeds against its targets." *Cochran v. SEC*, 20 F.4th 194, 233 (5th Cir. 2021) (en banc) (Oldham, J., concurring), *cert. granted*, 142 S. Ct. 2707 (2022).

Second, Burgess will continue to suffer the harm of being subjected to an unconstitutional administrative process unless this Court issues an injunction.  *See* Compl. ¶ 83.  The Supreme Court has confirmed that a private citizen experiences a "here-and-now" injury as soon as he or she is exposed to an unconstitutional process of the type at issue here.  *Bowsher v. Synar*, 478 U.S. 714, 728 n.5 (1986); *see Seila Law*, 140 S. Ct. at 2196; *PCAOB*, 561 U.S. at 513 (parties are "entitled to declaratory relief sufficient to ensure that the [legal] standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive").

Third, regardless of the content of the Final Decision, the ongoing pendency of the Enforcement Proceeding is causing Burgess a reputational harm that can only be arrested by an injunction.  *See* Ex. A (Burgess Affidavit) ¶¶ 6-7;  Compl. ¶ 84.  Courts routinely find that reputational harm can constitute an irreparable injury.  *Doe v. Texas Christian Univ*., No. 4:22-cv-00297-O, 2022 WL 1573074, at *11 (N.D. Tex. Apr. 29, 2022) (citing *Valley v. Rapides Par. Sch. Bd*., 118 F.3d 1047, 1056 (5th Cir. 1997)).  As a businessman and entrepreneur, Burgess's reputation is his livelihood.  He has already worked tirelessly to rebuild his reputation after the

FDIC Board's Final Decision against him in 2017, but his reputation will never fully recover from what it once was while the Enforcement Proceeding continues.  Ex. A (Burgess Affidavit) ¶¶ 6-7.

Fourth, and again irrespective of the content of the Final Decision, the ongoing pendency of the Enforcement Proceeding is causing economic harm to Burgess.  *See* Ex. A (Burgess Affidavit) ¶ 12; Compl. ¶ 85.  Absent an injunction, Burgess will be forced to continue incurring a fortune in legal expenses to navigate the FDIC's process (and the subsequent process for judicial review).  Those expenses include fees for the preparation of his exceptions to ALJ Whang's Recommended Decision (and his responses to the FDIC's own exceptions, if any), as well as fees associated with seeking stays and judicial review of a Final Decision from the Fifth Circuit.  All of those expenses will be a waste if Burgess is vindicated on any of the Counts in his Complaint.

Fifth, the FDIC's imminent Final Decision will likely rule against Burgess.  And that will trigger an onslaught of serious penalties, likely including removal, prohibition, and a six-figure civil monetary penalty.  Those sanctions will be extraordinarily harmful to Burgess and clearly constitute irreparable harms.  *See Burgess*, 871 F.3d at 304 (crediting Burgess's arguments that the Enforcement Proceeding threatened to "destruct[]" his "career in his chosen profession of banking" and that the FDIC's "constitutionally infirm hearing . . . injured [his] reputation and ability to procure comparable employment" (internal quotation marks and ellipsis omitted)).

As a final matter, it also bears noting that, even in the unlikely event that the FDIC's Final Decision is in Burgess's favor, the Enforcement Proceeding still would have caused irreparable injuries to Burgess, and that Burgess would have no remedy for those injuries, because he could not file a petition for review challenging an agency ruling in his favor.[7]  As Judge Oldham

---

[7] The possibility that Burgess could be deprived of meaningful relief absent quick action by this Court is much more than a mere hypothetical.  *In re Patrick Adams* (No. OCC AA-EC-11-50) is instructive.  In that case, an OFIA ALJ issued a Recommended Decision in a matter pertaining to a Notice of Charges brought against Mr. Adams by the Comptroller.  The ALJ ruled in Mr. Adams's favor and recommended that the Notice be dismissed in its entirety.  The

explained, that reality only further underscores the need to allow Burgess to proceed with this case—and to timely issue an injunction. *See Cochran*, 20 F.4th at 230 (Oldham, J., concurring).

### C.   The Equities Favor the Issuance of an Injunction, and an Injunction Would Not Disserve the Public Interest.

The equities in this case clearly favor the issuance of an injunction. Allowing the FDIC to proceed with the Enforcement Action and enter a Final Decision would not just harm Burgess personally, but also the public at large. For example, allowing the Enforcement Proceeding to continue would cause significant harms to Herring Bank and its depositors. As Burgess explains in the attached Affidavit, the Enforcement Proceeding has harmed "the reputation of the Bank," has "deterred business from the Bank," and has caused "significant hesitation with counter-parties doing business with the bank," and has caused the Bank "to suffer lost opportunities." Ex. A (Burgess Affidavit) ¶¶ 8, 11; *see id.* ¶ 8 ("The Bank operates in many small towns, mostly in Texas, where reputation is everything."). Moreover, the "Enforcement Proceeding has caused stress and strain on the Bank's employees," leading to "issues with retaining and hiring employees." *Id.* ¶ 9. Time and energy that should be spent on the Bank's customers and the Bank's overall financial health will instead be spent navigating the FDIC's convoluted regulatory scheme. *See id.* ¶¶ 9-10. The case law is clear that injuries of this type are highly probative to the question of whether an injunction is warranted. *See Scott v. S. Elec. Supply Co.*, No. 12-cv-119, 2013 WL 3280276, at *3 (N.D. Miss. June 27, 2013) ("A loss of a business' customers and damage to its goodwill are widely

---

Comptroller then issued a Final Decision that declined to adopt the Recommended Decision, reached conclusions that "reflected agreement with Enforcement Counsel," found that the record "could" support findings of regulatory and banking law violations and a decision to impose civil monetary penalties, but then dismissed the charges against Mr. Adams, such that he was unable to appeal the Final Decision. The *Adams* matter illustrates that agency proceedings of the type at issue here can inflict significant harms on regulated parties while also depriving those regulated parties of meaningful review by Article III courts.

recognized as injuries incapable of ascertainment in monetary terms and must thus be irreparable." (internal quotation marks omitted)).

Moreover, the FDIC's impending Final Decision will likely order Burgess to be removed from his role as a director of Herring Bank.  At a prior stage of this very case, the Fifth Circuit confirmed that the "balance of hardships favor[ed] issuing a stay" of the FDIC's 2017 Final Decision because that Decision—much like the new Final Decision that will soon be issued— would harm the Bank itself, "which values [Burgess's] ongoing participation on the Board." *Burgess*, 871 F.3d at 304; *see id.* (crediting Burgess's arguments that "his continued participation on the board would benefit the Bank and its clients").  Burgess's "know-how and experience" are critical in "execut[ing] the Bank's strategic plan and help[ing] manage the Bank's risk profile," and therefore the Bank "will not be able to execute its strategic plan as effectively as it otherwise would" if "the Enforcement Proceeding is allowed to continue."  Ex. A (Burgess Affidavit) ¶¶ 10-11; *see id.* ¶ 14.

Conversely, neither the public nor the FDIC would suffer any harm as a result of a preliminary injunction.  *See* Ex. A (Burgess Affidavit) ¶ 13.  The Bank has already "implemented significant controls to address the issues raised by the FDIC's charges," and many of the expense-related practices that most concerned the FDIC (e.g., Burgess's possession of a bank-owned credit card) have long been suspended.  *See id.* ¶ 15.  Burgess no longer serves as the Bank's CEO and President, and the Bank's balance sheet and ratings are currently sound.  *See id.* ¶ 2, 15.  Therefore, if the Enforcement Proceeding is enjoined, there is no risk that the prior, years-past conduct to which the FDIC has objected will recur.

Finally, it bears mention that an injunction is always in the public interest when, as here, it is necessary to prevent constitutional deprivations. *SEALs*, 578 F. Supp. 3d at 840 (citing *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)).[8]

## II.   This Court Has Competent Subject-Matter Jurisdiction.

This Court has subject-matter jurisdiction because this is a "civil action[] arising under the Constitution." 28 U.S.C. § 1331. But given that Burgess's entitlement to a preliminary injunction is so clear under the test discussed above, Burgess anticipates that the Defendants may attempt to duck the constitutional claims presented here by arguing that two provisions in the Financial Institutions Supervisory Act of 1966 ("FISA"), now codified in 12 U.S.C. § 1818, deprive this Court of jurisdiction. *See* Ex. B at 3. As explained below, any such argument would be meritless.

### A.   12 U.S.C. § 1818(h) Does Not Divest This Court of Jurisdiction.

Defendants may suggest this Court lacks jurisdiction to hear this case because 12 U.S.C. § 1818(h) provides an alternative path to judicial review through which the target of an FDIC enforcement proceeding can wait for the agency to issue a Final Decision and then seek judicial review through a petition for review filed in an appropriate court of appeals. That argument is squarely foreclosed by the Fifth Circuit's recent en banc decision in *Cochran*.

*Cochran* involved the judicial-review provision of the Securities and Exchange Act of 1934, which allows the targets of an SEC enforcement action to challenge a final SEC order in the courts of appeals after it is issued. *See* 15 U.S.C. § 78y. The question presented was whether this

---

[8] Under Federal Rule of Civil Procedure 65(c), "[a] movant who obtains a preliminary injunction must post a bond to secure the non-movant against wrongful damages it suffers as a result of the injunction." *Texas v. United States*, 201 F. Supp. 3d 810, 818 (N.D. Tex. 2016), *order clarified*, No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016). But the Fifth Circuit has ruled that "the court 'may elect to require no security at all.'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)). This Court has waived plaintiffs' bond requirement when it found "no evidence that Defendants will suffer any financial loss requiring Plaintiffs to post security." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016). Burgess respectfully requests that the Court waive the bond requirement here.

statute stripped the district courts of jurisdiction to hear a case in which the plaintiff sought to enjoin a pending SEC proceeding on the basis of a structural constitutional defect involving removal protections for the agency's ALJs—i.e., the same claim presented in Count II of Burgess's Complaint). The Fifth Circuit held that it did not. 20 F.4th at 207, 213. In so holding, the Court emphasized that there was no sense in shutting the doors to the district courts because (1) the plaintiff's "structural" challenge was "wholly collateral" to the agency proceeding; (2) the "removal power claim is outside the [agency's] expertise"; and (3) foreclosing district-court jurisdiction would "deprive [plaintiffs] of the opportunity for meaningful judicial review" because it would force them to endure the very agency processes they challenged. *Id.* at 207-12. The same reasoning applies here, and ergo 12 U.S.C. § 1818(h) does not divest this Court of jurisdiction.[9]

### B.  12 U.S.C. § 1818(i)(1) Does Not Divest This Court of Jurisdiction.

Burgess also anticipates that Defendants may argue that 12 U.S.C. § 1818(i)(1) strips this Court of jurisdiction. That statute provides that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under [12 U.S.C. § 1818], or to review, modify, suspend, terminate, or set aside any such notice or order."

When a federal court is confronted with the question whether a statute strips it of its general federal-question jurisdiction, its analysis begins with the question of whether the statute **explicitly** strips district-court jurisdiction. If it does, that is the end of the inquiry; if it does not, the court next considers whether the statute **implicitly** strips jurisdiction. *See PCAOB*, 561 U.S. at 489. The

---

[9] The United States Supreme Court granted certiorari in *Cochran* in May of 2022, and has scheduled that case for oral argument on November 7. Burgess would not be opposed to staying this action pending the Supreme Court's disposition of *Cochran*, subject to the condition that the FDIC Enforcement Proceeding against Burgess is likewise stayed until such time as *Cochran* is decided. Other courts in this District have ordered that exact relief when recently presented with constitutional challenges to an agency's structure akin to the types of challenges that Burgess is pursuing here. *See* Order, *Rover Pipeline, LLC v. Federal Energy Regulatory Commission* (N.D. Tex. No. 3:22-cv-00232), ECF 34 (May 24, 2022) (Scholer, J.) (in case where plaintiffs presented constitutional challenge to the ALJs used by the Federal Energy Regulatory Commission ("FERC") while a FERC case was pending against them, staying both the plaintiffs' complaint and the underlying FERC action pending disposition of *Cochran*).

analysis of implicit jurisdiction-stripping is guided by the so-called *Thunder Basin* factors, which are intended to determine whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Cochran*, 20 F.4th at 206 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).  The three *Thunder Basin* factors are (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the district-court action is "wholly collateral to a statute's review provisions"; and (3) whether the claims at issue are "outside the agency's expertise."  *Id.* (internal quotation marks omitted).

As explained in detail below, Section 1818(i)(1) does not divest this Court of jurisdiction either explicitly (*see infra* Section II.B.1) or implicitly (*see infra* Section II.B.2).

### 1.    Section 1818(i)(1) Does Not Explicitly Bar Jurisdiction Over Structural Constitutional Claims of the Type Presented in Burgess's Complaint.

Section 1818(i)(1) does not explicitly strip jurisdiction over **structural** constitutional claims of the type presented here.  Burgess of course agrees that Section 1818(i)(1) would explicitly strip jurisdiction if a plaintiff sought to enjoin an FDIC proceeding on the basis of some irregularity that was internal to the proceeding itself.  For that reason, the Fifth Circuit correctly held in *Bank of Louisiana v. FDIC* that a district court lacked jurisdiction to enjoin an FDIC proceeding on the basis of purported constitutional violations that occurred **as part of or within the proceeding**, such as age discrimination and due-process violations pertaining to "document admissibility and witness sequestration."  919 F.3d 916, 921 (5th Cir. 2019); *accord Cochran*, 20 F.4th at 204 (en banc) (construing Section 1818(i)(1) as an "explicit jurisdictional bar" with respect to the types of non-collateral claims presented by the plaintiff in *Bank of Louisiana*).

But this case does not fall within the ambit of Section 1818(i)(1) because here Burgess is pursuing **structural** constitutional claims that are **exogenous** to the Enforcement Proceeding. Cognizant of the limitations imposed by Section 1818(i)(1), Burgess elected not to include in his

Complaint certain claims that he believes are meritorious, but which relate to conduct within the four corners of the Enforcement Proceeding (e.g., claims that the agency has behaved in a biased manner and has misinterpreted various statutes). This Court would lack jurisdiction to consider those claims. But the situation is materially different with respect to the claims that Burgess has presented here, because those claims—unlike those in *Bank of Louisiana*—each relate to structural defects such as separation-of-powers concerns and a violation of the Seventh Amendment.

Judge Haynes, who wrote the majority opinion for the en banc Court in *Cochran*, expressly acknowledged this crucial and dispositive distinction. As a dissenter at the panel stage of that case, Judge Haynes correctly noted that *Bank of Louisiana* "did not address a structural claim" and did not preclude the possibility that "a claim concerning the President's removal power should be analyzed differently than other types of constitutional claims" when considering the jurisdictional implications of Section 1818(i)(1). *Cochran v. SEC*, 969 F.3d 507, 518 (5th Cir. 2020) (Haynes, J., dissenting in part); *accord Bank of Louisiana v. FDIC*, No. 16-cv-13585, 2017 WL 3849340, at *6 (E.D. La. Jan. 13, 2017) (clarifying that the *Bank of Louisiana* "plaintiffs d[id] **not** question the constitutionality or inherent authority of the FDIC" and then suggesting that the answer to the jurisdictional question in *Bank of Louisiana* may well have been different if the plaintiffs had done something more than just "attack the motives underlying the FDIC's" enforcement proceeding (emphasis added)).

The key insight from the Fifth Circuit's most recent case law is that, for purposes of Section 1818(i)(1), there is a material difference between (1) structural constitutional claims that are wholly collateral to the agency proceeding and (2) constitutional "claims alleging 'irregularities' during an enforcement proceeding," which "are not wholly collateral, either procedurally or substantively." *Cochran*, 969 F.3d at 518 n.1 (Haynes, J., dissenting in part) (quoting *Bank of*

*Louisiana*, 919 F.3d at 928-29).  With respect to the claims in the second camp, Section 1818(i)(1) strips jurisdiction, because a collateral attack pertaining to "irregularities" in the agency process is an effort to "review" or "modify" the agency's actions **within** the proceeding.  But with respect to structural constitutional claims that fall into the first camp, Section 1818(i)(1) is simply silent.

This Court's decision about whether to interpret Section 1818(i)(1) as an explicit bar over the district courts' power to hear structural constitutional claims should be guided by the Supreme Court's instruction "that where Congress intends to preclude judicial review of constitutional claims," its "intent to do so must be clear."  *Webster v. Doe*, 486 U.S. 592, 603 (1988); *accord McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (interpreting jurisdiction-stripping provision of the INA to apply only to collateral attacks on denials of a certain type of immigration status, and not to "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications").  Section 1818(i)(1) does not clearly foreclose jurisdiction over structural constitutional claims, and nor would that result comport with the statute's purposes or legislative history.  *See infra* note 11.

It also bears mention that Congress knows how to explicitly strip district-court jurisdiction over structural constitutional claims when it wants to do so, and has done so in other statutes.[10] The fact that Congress elected to expressly strip jurisdiction over constitutional claims in other laws but not in Section 1818(i)(1) lends further support to the notion that this Court retains subject-matter jurisdiction.  "[W]here Congress knows how to say something but chooses not to, its silence is controlling."  *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (internal quotation marks omitted); *accord I.A.M. Nat'l Pension Fund Benedit Plan C. v. Stockton*

---

[10] *See, e.g.*, 18 U.S.C. § 1252(b)(9) (judicial-review provision within the Immigration and Nationality Act) ("Judicial review of **all questions of law and fact, including interpretation and application of constitutional and statutory provisions**, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section." (emphasis added)).

*TRI Indus.*, 727 F.2d 1204, 1209 (D.C. Cir. 1984) ("Congress knows how to withdraw jurisdiction expressly when that is its purpose" (internal quotation marks omitted)); *see also Atl. Sounding Co. v. Townsend*, 557 U.S. 404 (2009).[11]

As a final matter, Burgess notes that interpreting Section 1818(i)(1) to explicitly strip district-court jurisdiction over structural constitutional claims would itself present serious constitutional concerns by creating a situation in which plaintiffs like Burgess have no opportunity to secure a meaningful remedy for violations of the separation-of-powers doctrine. The theoretical justification for the well-established rule that Congress cannot strip all federal courts of power to hear constitutional claims is that at least some Article III court must be available to serve as a "meaningful check on the political branches."[12]  *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986) (noting that a scheme which operates to deny meaningful judicial review for a constitutional question would itself raise "serious constitutional question[s]"). Interpreting Section 1818(i)(1) to explicitly foreclose district-court jurisdiction over structural constitutional claims would run afoul of that principle, because that interpretation of Section 1818(i)(1)—in combination with the difficult-to-satisfy requirements for retrospective relief

---

[11] To the extent this Court might find legislative history probative, it is notable that nothing in the legislative history of FISA suggests any intent to strip district-court jurisdiction over structural constitutional claims. The Senate Report for FISA suggests that the overarching purpose of the statute's judicial-review provision was to allow "such review [to] be expedited." S. Rep. No. 1482, at 15 (1966). Allowing structural constitutional claims to be brought in federal district court would certainly lead to a much more expeditious resolution of those claims than could be provided by a court of appeals. Moreover, FISA's Senate Report acknowledges that other provisions of the statute now codified at 12 U.S.C. § 1818 do allow review in the district courts when the claims are wholly collateral to the proceeding. For example, the provision at 12 U.S.C. § 1818(c) allows district courts to hear claims challenging temporary cease-and-desist order issued by the FDIC. Congress's explanation for that provision was that judicial review of cease-and-desist orders was permissible because "[s]uch an application would, of course, be ancillary to the administrative proceedings" and "would not extend to full consideration of the merits of the Board's charges." S. Rep. No. 1482, at 22. The exact same reasoning applies to structural constitutional claims of the type at issue here.

[12] Martin J. Katz, *Guantanamo,* Boumediene*, and Jurisdiction-Stripping: The Imperial President Meets the Imperial Court*, 25 Const. Comment. 377, 406 (2009). For this reason, the "Reagan Administration opposed the efforts of social conservatives to strip federal jurisdiction over constitutional claims like school prayer and abortion," even "though President Reagan described the Supreme Court's jurisprudence in those areas as 'not in keeping with the Constitution at all.'" Tara Leigh Grove, *A (Modest) Separation of Powers Success Story*, 87 Notre Dame L. Rev. 1647, 1662 (2012).

prescribed in *Collins*—would functionally leave Burgess and like litigants without any meaningful remedy for the structural constitutional harms they have suffered. This Court could avoid that outcome by invoking the canon of constitutional avoidance, and interpreting Section 1818(i)(1) to allow district courts to hear structural constitutional claims. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (discussing the important role of the constitutional avoidance canon as "a tool for choosing between competing plausible interpretations of a statutory text").

The FDIC's jurisdictional argument is a serious affront to individual liberty. If the FDIC's reading of Section 1818(i)(1) were correct, structural constitutional challenges could only be presented to the agency itself. That is like insisting that the only person qualified to guard the henhouse is the fox. The FDIC's position ignores the fact that bureaucrats have no expertise over constitutional questions, but do have a "tendency . . . to perpetuate and to increase their administrative powers." Roland L. Redmond, *The Securities Exchange Act of 1934: An Experiment in Administrative Law*, 47 Yale L.J. 622, 635 (1938). The FDIC's position would leave litigants stuck between a rock and a hard place, unable to seek review in federal court and likewise unable to avoid enduring the very process they wish to challenge—at great loss of time and money—before ever having an opportunity to challenge that process (and even then being unable to secure any retrospective relief in almost all cases). That is not—and cannot be—the law.

### 2.      Section 1818(i)(1) Does Not Implicitly Bar This Court's Jurisdiction.

Because Section 1818(i)(1) does not **explicitly** strip district-court jurisdiction over structural constitutional claims, the general federal-question statute at 28 U.S.C. § 1331 would confer jurisdiction over structural constitutional claims of the type at issue here unless the text of Section 1818(i)(1) evinces an intent by Congress to **implicitly** strip jurisdiction over such claims. And clearly it does not. That result is compelled by a straight-forward application of *Thunder Basin*.

The first *Thunder Basin* factor is whether "a finding of preclusion could foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212-13. The Fifth Circuit's en banc decision in *Cochran* confirmed that there would be no "opportunity for meaningful judicial review" if a plaintiff who is "challenging the constitutional authority of" the agency was forced to litigate his or her claims before the agency instead of in district court. 20 F.4th at 208-09. That was so for several independent reasons, all of which apply with equal force here and in *Cochran*.

First, *Cochran* explained that a scheme allowing a regulated party to seek judicial review only by waiting for a final agency action and then appealing to the court of appeals "does not guarantee [the plaintiff] meaningful judicial review of her claim because the enforcement proceedings will not necessarily result in a final adverse order," meaning that the plaintiff could be "left unable to seek redress for the injury of having to appear before the [agency]." *Id.* at 209. Second, the Court found that judicial review would not be "meaningful" if the plaintiff was forced to endure the very unconstitutional agency process that she sought to enjoin through her federal action. *See id.* at 208, 210. And finally, Judge Oldham's concurring opinion—which was joined by five other Judges—presciently explained that leaving the door open to federal-court actions challenging agency proceedings was particularly important given that it is "very challenging to obtain meaningful retrospective relief after *Collins*." *See id.* at 232-34 (Oldham, J., concurring). That means that prospective challenges styled as declaratory-judgment actions may now "be the only way to provide a 'meaningful avenue of relief' for structural constitutional challenges." *Id.*

All of the considerations discussed in *Cochran* apply with equal force here. First, Burgess could be deprived of any judicial review of his constitutional claims if the FDIC issues a Final Decision that is favorable to him, or if he settles. *See supra* at 20 & note 7. Second, it would be profoundly unfair to force Burgess to continue enduring the very unconstitutional process he seeks

to enjoin in order to secure ultimate judicial relief.  And third, Burgess's chance to secure meaningful relief will be diminished if he is forced to wait for a Final Decision, because then the only available remedy would be retrospective—and much harder to obtain.  *See supra* at 17-18.

The second *Thunder Basin* factor is whether the claims at issue are "wholly collateral" to the agency's proceeding and to the alternative process for judicial review.  *Thunder Basin*, 510 U.S. at 212.  *Cochran* held that a claim is "wholly collateral" when the "nature of [the] challenge is structural"—i.e., when "it does not depend on the validity of any substantive aspect" of the agency's enabling statutes or orders.  20 F.4th at 207-09.  Burgess's claim is clearly collateral given that he is pursuing structural challenges to the FDIC that do not depend at all on any substantive aspect of the Enforcement Proceeding.  *See* Compl. ¶ 6.

The third *Thunder Basin* factor is whether the claims at issue are "outside the agency's expertise."  *Thunder Basin*, 510 U.S. at 212.  Burgess's claims fall outside the agency's expertise because, like the claims in *Cochran*, they present questions of constitutional law as to which the FDIC has no special expertise.  *See Cochran*, 20 F.4th at 208; *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021) ("[A]gency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise.").

In sum, Section 1818(i)(1) does not explicitly divest this Court of jurisdiction, and an application of the *Thunder Basin* factors confirms that this statute does not implicitly divest this Court of jurisdiction either.  Thus, this Court has federal-question jurisdiction under 28 U.S.C. § 1331.  *See Mata v. Lynch*, 576 U.S. 143, 150 (2015) (noting that federal courts have a "virtually unflagging obligation" to exercise their jurisdiction under Section 1331); *Cochran* 20 F.4th at 200.

### III.    This Court Should Enter a Temporary Administrative Stay Pending Disposition of this Motion.

On October 12, counsel for Burgess conferenced with Defendants' counsel and requested that Defendants agree to delay a Final Decision until this Court has ruled on this Motion.  The following day, counsel for Defendants stated by email that they would not agree to that request, and confirmed that a Final Decision could be issued as soon as "the deadline for submitting exceptions has passed, which is October 17th.," and the parties have been notified that the proceeding has been submitted for final decision.  Ex. B at 4.  On October 14, Burgess's counsel advised Defendants' counsel that, in light of the FDIC's unwillingness to delay a Final Decision, this Motion would include a request for a temporary administrative stay in order to preserve this Court's ability to order relief.  *Id.* at 3-4.  Defendants advised that they opposed a stay.  *Id.* at 1-3.

The Defendants characterized the "exigency here" as being "of [P]laintiff's own making" based on the fact that the Enforcement Proceeding has been ongoing for years.  Ex. B at 5. However, Burgess began diligently preparing his Complaint and this filing as soon as the Recommended Decision was issued mere weeks ago.  Prior to the issuance of the Recommended Decision, Burgess had hoped that ALJ Whang would find that liability is unwarranted for the reasons provided in Burgess's extensive post-hearing briefing.  In any event, Defendants' counsel is incorrect to suggest that Burgess could have filed this case "years" ago, because Burgess's claims depend in large part on the Fifth Circuit's very recent decisions in *Cochran* and *Jarkesy*.

Moreover, Burgess only recently learned that the FDIC Board might act more quickly in issuing its Final Decision than it did in 2017.  The FDIC's Board requested an official copy of the administrative record in the Enforcement Proceeding on October 4, prior to the deadline for the parties to file their exceptions to the Recommended Decision.  *See* Compl. ¶ 79.  Burgess is not aware of a similar request being made by the FDIC Board in 2017 and, during that prior

proceeding, he was not made aware that the record had been submitted to the FDIC Board for final decision until **after** the parties had filed **reply** briefs in support of their exceptions.

The exigency here—at least as it relates to the necessity of a temporary administrative stay—is better described as being of the **Defendants'** own making.   Given the FDIC's intransigency and its refusal to guarantee that it will not issue a Final Decision while this Motion is pending, Burgess must respectfully request that this Court issue a temporary administrative stay.

According to the Fifth Circuit, "[e]ntering temporary administrative stays so that a panel may consider expedited briefing in emergency cases is a routine practice."  *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020).  The authority to issue such stays is not limited to courts of appeals; the Fifth Circuit made clear that the authority to issue such stays is found within the "power inherent in **every court** to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Id.* (emphasis added) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *see* Rachel Bayefsky, *Administrative Stays: Power and Procedure,* 97 Notre Dame L. Rev. 1941, 1960-64 (2022) (discussing the increasing use of administrative stays by federal courts based on their authority under the All Writs Act, 28 U.S.C. § 1651, and under federal judges' inherent equitable authority to manage their own docket).  An administrative stay is a device that is "only intended to preserve the status quo until" some other "substantive" motion "can be considered on the merits," and it "does not constitute in any way a decision as to the merits" of the plaintiff's contentions.  *Nat'l Urb. League v. Ross*, 977 F.3d 698, 700-01 (9th Cir. 2020) (quoting *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019)).

Temporary administrative stays are appropriate when "warranted in [the court's] reasoned judgment."  *In re Abbot*, 800 F. App'x at 298 (Dennis, J. dissenting).  Here, the Court should find it within its "reasoned judgment" to issue a temporary stay that will prevent the FDIC Board from

issuing its Final Decision before this Court has had the opportunity to rule on Burgess's Motion. That is so for two reasons.

First, Burgess will suffer irreparable harm if the FDIC Board issues a Final Decision prior to this Court having the opportunity to rule on his request for a preliminary injunction. As discussed above, Burgess has reason to believe the FDIC Board might not take its full allotted 90 days, and, upon issuance of an adverse Final Decision, Burgess's requests for relief in Counts 1 and 2 of his Complaint will transform from prospective to retrospective requests for relief, which in turn will materially reduce his chances of securing a meaningful remedy. Moreover, the other harms detailed above will begin the minute the Final Decision is issued. *See supra* Section I.B.

Second, as a result of this expedited briefing schedule, a temporary administrative stay will cause no harm for Defendants. On October 17, the parties will file their exceptions, and the FDIC's Administrative Officer will then notify the parties that proceeding has been submitted to the Board; after that happens, the FDIC's Board could issue a Final Decision at any time. 12 C.F.R. § 308.40(c)(2). However, the FDIC Board has up to 90 days from when the case is submitted for its review to issue a decision. *Id.* Therefore, an exceptionally brief administrative stay that temporarily prevents the FDIC Board from issuing its Final Decision would allow this Court to rule on Burgess's Motion without prejudicing the FDIC's ability to issue its order. *See Richardson v. Texas Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020) (granting a temporary administrative stay that lasted approximately one month until the court was able to rule on the defendant's motion).[13] Furthermore, since granting a temporary administrative stay says nothing as to whether this Court will ultimately grant or deny Burgess's Motion, the temporary administrative stay itself

---

[13] A temporary administrative stay is particularly appropriate here given that this Court has already issued an expedited briefing schedule for Burgess's preliminary-injunction motion. This case is therefore closely akin to *In re Abbot*, where the Fifth Circuit ruled that a temporary administrative stay was warranted because the panel had "ordered expedited briefing on the underlying stay motion and mandamus petitions." 800 F. App'x at 298.

will not harm the Defendants' ability to issue their Final Decision. *See Nat'l Urb. League*, 977 F.3d at 701; *Trivedi v. Gen. Elec. Co.*, No. 19-11862-PBS, 2021 WL 2229088, at *1 (D. Mass. May 27, 2021), *aff'd*, No. 21-1434, 2022 WL 1769136 (1st Cir. May 3, 2022) (lifting a previously-issued administrative stay while denying a preliminary injunction).

## **CONCLUSION**

This Court should enter a preliminary injunction barring the Defendants from continuing the Enforcement Proceeding and, in the interim, enter a temporary administrative stay.

Dated:  October 15, 2022                    Respectfully submitted,

                                                            */s/ Manuel G. Berrelez*

                                                            Manuel G. Berrelez (Texas Bar No. 24057760)
                                                                mberrelez@velaw.com
                                                            Thomas P. Mitsch (Texas Bar No. No. 24102218)
                                                                tmitsch@velaw.com
                                                            James F. Hopper (Texas Bar No. 24116535)
                                                                jhopper@velaw.com
                                                            Madelyn B. Carter (Texas Bar No. 24121529)
                                                                mcarter@velaw.com
                                                            VINSON & ELKINS LLP
                                                            Trammell Crow Center
                                                            2001 Ross Avenue, Suite 3900
                                                            Dallas, Texas 75201
                                                            Telephone: (214) 220-7700
                                                            Facsimile: (214) 220-7716

                                                            *Counsel for Plaintiff Cornelius Campbell Burgess*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of October, 2022, I caused the foregoing document to be filed with the Clerk of the U.S. District Court for the Northern District of Texas via the Court's CM/ECF system.  I further certify that service was accomplished today by sending hard copies of the same to the Defendants at the mailing address for Defendants' counsel below:

> **Andrew Dober**
> Counsel
> Federal Deposit Insurance Corporation
> 3501 Fairfax Dr.
> Arlington, VA 22205

The undersigned counsel also emailed courtesy copies of the same to Defendants' counsel Andrew Dober (at adober@fdic.gov) and Andrew Nicely (at anicely@fdic.gov).

Dated:  October 15, 2022         Respectfully submitted,

*/s/ Manuel G. Berrelez*

Manuel G. Berrelez (Texas Bar No. 24057760)
  mberrelez@velaw.com
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716

*Counsel for Plaintiff Cornelius Campbell Burgess*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the applicable type-volume limitation because it contains no more than 35 pages, which was the length limit set in this Court's Order of October 14, 2022 (ECF No. 14).

Dated:  October 15, 2022                    Respectfully submitted,

*/s/ Manuel G. Berrelez*

Manuel G. Berrelez (Texas Bar No. 24057760)
   mberrelez@velaw.com
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716

*Counsel for Plaintiff Cornelius Campbell Burgess*

37